THE B. C. TERRY.

*(District Court, S. D. Georgia.   December 14, 1881.)*

1. DERELICT—SALVAGE COMPENSATION.
     Salvors in derelict cases are entitled to adequate compensation, according to the circumstances of each case.   A rule of fixed proportions no longer obtains.

2. SAME.
     When the officers and crew of a burning vessel leave.it, without any intention of returning to resume possession, or hope of saving it, it is a case of derelict in the sense of the maritime law; or, if not in the exact and technical meaning of the term, a case of derelict, a case of *quasi* derelict, equally meritorious, though the vessel at the time is in a navigable river, and the master, mate, and some of the crew return to it one or more times before the fire is subdued.

In Admiralty.

*Mr. Levy* and *Mr. Abrams,* for libellants and intervenor.

*Mr. Mercer,* for respondents.

ERSKINE, D. J.   On the nineteenth of last April, H. J. Dickerson and others, as owners of the steam-tugs Forest City and Benjamin Bramell, filed a libel in this court, and upon certain alleged grounds therein prayed a decree for salvage against the schooner B. C. Terry and cargo, which cargo consisted of crude sulphur and empty barrels; and on the twenty-seventh of the same month the American Dredging Company lodged an intervention against the same property, and likewise asked for a decree of salvage.   The schooner has been sold and the proceeds deposited in the registry.   At the opening of the cause it was agreed that the value of the schooner, or rather her proceeds, should be put at $2,500; the crude sulphur at $5,750; and

the empty barrels at $1,544,—aggregating $9,794. It was not questioned by the respondents—claimants of the schooner and cargo—that the aid rendered by the steam-tugs was salvage service, but they contested the legal right of the libellants (with whom is included the intervenor) to be awarded the *quantum* of compensation demanded.

The steam-boat Wheeless, partly laden with cotton bales on deck, while lying at a wharf in the city of Savannah, caught fire, and about 15 minutes afterwards left her moorings, and, the wind being south-westerly, drifted in a north-easterly direction, and ultimately came in contact with the schooner B. C. Terry, lying at anchor midway the river, with her head up stream, striking her on the windward or port bow, abreast the fore-rigging. The vessels became entangled, and floated with the stream and ebb tide, until brought up near the left bank by the Terry's anchor, which, on the approach of the burning steam-boat, was hove up; but when they collided the chain was paid out, and the anchor again took the bottom, and, I apprehend, dragged awhile. Presently the steam tug-boat Bramell came to the windward, and ahead of the Wheeless,—she and the schooner being then on fire,—and towed her away from along-side the Terry. Just at the time the Wheeless was being towed off, the flames from her and from three bales of cotton, which had fallen from her deck upon that of the Terry, were sweeping the schooner, and had set on fire her sails, rigging, spars, waist, and parts of her upper works, which burned rapidly, and continued to burn until subdued and extinguished by the tug M. T. White, aided by the Bramell and Forest City.

The libellants assert a derelict salvage; that during the entire time of the service of the steam-tugs, respectively, the Terry was abandoned by her crew, without any intention on their part of returning to her, or any hope of saving or recovering her by their own exertions. If so abandoned, she was derelict, although she was afterwards saved by the crew that left her, they having unexpectedly received assistance. 2 Parsons, Shipp. & Adm.

In this case the master and mate and two or three of the crew twice returned on board the schooner before the fire—at least in one instance—was extinguished, but there is no pretence that they saved or assisted to save the vessel.

1. As to the abandonment I shall give the substance of the testimony on this question. The depositions are lengthy, and many portions relate a variety of matter not pertinent to the issues for decision

in this cause. It appears from the evidence that the steam-boat Wheeless, about 15 minutes after the flames were seen from the shooner B. C. Terry, floated from the wharf in the direction of the schooner, then lying at anchor near the middle of the river, with her bow up stream, and struck her on the port bow abreast the fore-rigging; that as the Wheeless approached her she lowered a boat and got it ready; that about the time the Wheeless came along-side of the Terry she was burning very fiercely, and set the Terry on fire, but the fire on the steam-boat abated as the burning cotton bales dropped from her, two or three falling upon the deck of the schooner; that the flames from the Wheeless, then lying along-side, were flying across her, so that the officers and crew could remain no longer on board; that then the master, mates, Kates, and the rest of the crew left in the already-prepared small boat, and subsequently took a position to windward of the fire. Shortly after the steam tug-boat Bramell had hauled away the Wheeless, the master, a mate, and one or two of the crew returned to the Terry—no steam-tug being then present—for the purpose, not of resuming possession of or dominion over the schooner, but, on the contrary, as the master and first mate state in their testimony, they went on board to bring away their own clothes and other property. The fire, however, was then so hot that they were forced to leave the vessel "without getting all their things;" and when they next boarded her the steam tug-boat M. T. White was lying on her windward or port side, and throwing a stream of water on her from a steam fire-pump hose. Nor, on this visit, did the master or any of the crew resume possession of the vessel or cargo, or indicate any intention to do so, or assume any authority whatever? *The Bee*, 1 Ware, 332.

Such are the most material facts on this immediate question, as they appear in the evidence, principally as they were stated by the master and mate of the Terry, and the witness Kates; and they being undisputed, and upon these facts, I am of opinion that this is a case of derelict, in the sense of the maritime law. For a careful perusal of the entire evidence, more especially on this particular subject, has satisfied my mind that when the officers and crew of the schooner left her, after the burning steamboat had come along-side and set her on fire, they abandoned and deserted her, *sine animo revertendi, sine spe recuperandi. The Lama*, 14 Wall. 336. If, however, this is not, in the exact and technical meaning of the term, a case of derelict, nevertheless it may well be considered a case of *quasi* derelict, equally

meritorious, and it may not be foreign to remark here that a vessel may be quite derelict on navigable streams and tide-waters, as well as on sea-coasts or on the ocean.

2. As to the salvage service of the Bramell, White, and Forest City, respectively. Some 20 minutes subsequent to the collision, and while the Wheeless and Terry were still in flames, the Bramell came from the windward and took a position 40 yards ahead of them, and sent a boat to the Wheeless and attached a line to her. This done, she towed her from along-side the Terry, and down the river to the flats, a distance of nearly half a mile, keeping herself as well to windward as possible. Not long after leaving her on the flats the Bramell returned to the Terry, and at once began to throw a stream of water on her. There is diversity in the evidence as to the time she returned to the Terry, and as to the then state of the fire. Hudson, master of the White, testifies that "about half an hour from the time she towed off the Wheeless she came back and commenced playing a stream of water on her; the fire was pretty well under control when she came." Darby, senior master on the White, says that "she came back in half an hour or an hour after we had been working, and had got the fire smothered; I considered it out." Hyer, master of the Terry, says: "The White, I think, played half an hour on the Terry; the fire was almost extinguished when the Bramell came up." His mate says that when the second tug (Bramell) came up "the fire was nearly extinguished." His steward says "the best of the fire was then out," and Kates "thinks the White had been there about 20 minutes when the Bramell came up, and the fire was then pretty well out." When the White saw the Wheeless on fire at the wharf she hitched on to the tug-boat Lightning, owned also by the American Dredging Company, and towed her to the oil company's dock. There, casting her loose, the White steamed to within 15 feet, on the weather side, of the Terry, which was then burning very rapidly, and played a two inch and three-quarter stream of water from a steam fire-pump hose on her waist. And Hudson testifies that the fire was then so hot that it scorched the paint on the White, and that the fire-pumps used could throw a good body of water 30 feet. Quenching this fire, she came along-side and hooked on to a chain plate, and continued throwing the stream of water against the fire on her deck, midship-house hatches,—one being nearly burned through,—spars, and rigging, until the fire was subdued and extin-

guished. In these services the Bramell and Forest City rendered some assistance to the White.

Immediately after the steam-boat and schooner collided they drifted with the stream and tide towards the left bank of the river, until the Terry's anchor brought them up nearly along-side the steam-tugs Forest City, Commodore Foote, and Constitution, then lying at a wharf hard aground, and none with steam up; and, they being to leeward, the flames from the entangled vessels, or from one of them, set the Forest City and another tug on fire. The evidence as to the aid given by the Forest City to overcome the fire on the Terry discloses that it was not until it was under control and almost extinguished by the White, that the Forest City,—then within 10 feet of of the Terry's starboard bow,—as she endeavored to subdue the fire on herself and the other boats, would throw a little water occasionally on the jib-boom of the Terry from her hand-pump, which a witness says cast a larger stream than the steam fire-pump of the White. "And when the fire on the schooner Terry was nearly extinguished, and when she had conquered the fire on herself, and on the Foote and Constitution, she threw more water on her than at first," and that the fire on the two tugs was vanquished before the Bramell returned to the schooner. Kates says:

"I saw the Forest City playing upon the tugs that were moored at the wharf; I think this was the principal thing she was doing; I only saw her throw an occasional spurt on the jib-boom of the Terry, and I was looking; I do not know how long she was playing before I saw her; I think not above five or ten minutes."

Hudson says that—

"The fire on the Forest City was put out by their own crew before I went to the Terry, and then they directed their efforts to put out the fire on the Commodore Foote and the Constitution."

Thus I have presented an outline of the controversy, and such testimony as is material to a clear understanding of the case.

Salvage offers a premium, by way of honorary requital, for intrepidity and timely assistance to save property as well as life, and is not a question of mere remuneration *pro opera et labore.*

The prompt movement of the Bramell in steaming to the burning vessels and towing off the Wheeless is well worthy of commendation; for it is manifest that this effectual action was the pioneer that ena-

bled the White to overcome and—aided by the Bramell and Forest City—ultimately to extinguish the fire on the Terry, and rescue her and her cargo, the greater part being crude sulphur in bulk, from imminent destruction. But on viewing all the surrounding circumstances—the position of the Bramell and White, always keeping the weather-gage; the moderate state of the wind, in broad day; on a navigable river, within the ebb and flow of the tide; possessing the propulsive agency of steam, and under easy and ready control—it cannot be claimed that the services of the Bramell and White were attended with hazard to either of them, or peril to their crews. It was, however, urged that the White was in immediate danger because the fire from the Terry scorched the paint on her side. Let this be so; yet it must not be forgotten that the scorching was due to temerity, in coming within 15 feet of the burning schooner, when their steam fire-pump, as Hudson testified, could throw a good body of water 30 feet; and it may also be noted that the witnesses, on the question of danger, expressed the opinion that neither the Bramell nor White was in any peril.

At the time the Forest City and the other tug-boats caught fire from one or both of the burning vessels she was under the lee of the schooner Terry, 10 feet from her starboard bow, fast aground, and without steam. She threw water from her hand-pump against the fire on these boats and herself until it was conquered, and at intervals, while thus employed, threw a little water on the jib-boom of the Terry; and after she had suppressed the fire on herself and the two tugs, she threw more water on her than previously.

It was argued for the respondents that the main purpose of the Bramell and Forest City was to save the tugs moored at the wharf, and that if the Wheeless had not been towed away by the Bramell and the fire extinguished on the Terry the tugs would have been destroyed by fire; and that the saving of the Terry was incidental and subordinate to the main purpose, and that this view is supported by the witness Darby, who proves that the master of the Forest City called on him to pull the Commodore Foote (Lynn?) out, and he refused, because he thought the best way to save the tugs was to put out the fire on the Terry; and that the court should consider these matters in estimating the *quantum* of salvage. It seems to me that the evidence of Darby fails to prove that the saving of the Terry and her cargo was incidental and subordinate to the asserted main purpose. But suppose such purpose did prompt

the Bramell and Forest City to aid in saving the Terry first, still I cannot perceive how that could affect the respondents injuriously, or why it should be a cause for diminishing the salvage compensation; and even if that purpose were conclusively proven, it could not legally be considered in awarding salvage remuneration. The court, in the case presented here, will look only at the services rendered to the Terry and cargo, and to the towing away of the Wheeless by the Bramell. If they performed salvage service for these tug-boats they have their remedy over, provided they possessed a valid, legal, and subsisting claim. In the case of *Le Tigre*, 4 Wash. 567, Mr. Justice Washington said:

"The owner whose property has been preserved from destruction by acts of a stranger, has no right to inquire into the motives which influenced his conduct, provided he acted legally."

The libellants and intervenor claim half, or at least a third, of the value of the salved property as a reward for their services. In England, the ancient rule alloting a moiety in derelict cases obtained up to the latter part of the reign of Charles II; then the admiralty courts changed the proportion, and so far relaxed the rule as to give a third in cases involving no great danger; and in those attended with extraordinary peril a moiety was still awarded. In the early part of the last century the correctness of a rule of fixed proportions began to be questioned, then discountenanced, and at length abandoned, and a flexible and more salutary rule was declared by the British admiralty tribunals; and, subsequently, (after much diversity of opinion in the federal courts,) the modern English rule was approved and adopted in this country by the supreme court of the United States in the case of *Post* v. *Jones*, 19 How. 150.

In the case of *The Thetis*, 3 Hagg. 14, the court said:

"All claims of specific proportions, and particularly the distinction of derelict, have been discountenanced, and may be said, indeed, never to have existed in modern times. * * * In cases of extreme hazard, one-third of the value, or one-fourth, or one-sixth, or one-ninth, or a sum of money only on account of salvage is given."

In *Post* v. *Jones*, *supra*, the court, by Mr. Justice Grier, said:

"The case before us is properly one of derelict. In such cases it has been frequently asserted, as a general rule, that the compensation should not be more than half, nor less than a third, of the property saved. But we agree

with Dr. Lushington (*The Florence*, 20 E. L. & C. R. 622) that the reward in derelict cases should be governed by the same principles as other salvage cases, namely, danger to property, value, risk of life, skill, labor, and the duration of the service;" and that "no valid reason can be assigned for fixing a reward for salving derelict property at a moiety, or any given proportion, and the true principle is adequate reward, according to the circumstances of the case."

**3.** As to compensation or rate of reward: "*Danger to property:*" The court has already ruled that neither the Bramell nor White was in danger. The Forest City was in some danger; not incurred, however, by reason of her salvage service to the Terry, but by being previously set on fire by one or both of the burning vessels. "*Value:*" The schooner and cargo were valued at $9,794. No evidence was given or agreement made as to the value of the Bramell, Forest City, or White. "*Risk of life:*" Although risk or danger to life is not a necessary element in salvage service, yet "what enhances the pretensions of salvors most," said Sir William Scott in the case of *The Blackford*, 3 Rob. 355, "is the actual danger which they have incurred. The value of human life is that which is, and ought to be, principally considered in the preservation of other men's property; and, if it be shown to have been hazarded, it is most highly estimated." The reason has been already assigned why the salvage enterprise of the Bramell and White was not accompanied with difficulty, personal exposure, or danger to life or limb. "*Skill:*" The alacrity, address, and knowledge of the employment displayed by the Bramell and White deserve approbation. "*Labor:*" It was done in the day-time, the weather mild, the wind light, and, from the facts and surrounding circumstances, it may be fairly inferred that the physical exertion was neither irksome nor fatiguing. "*Duration of the service:*" This is not a prominent ingredient in salvage ventures, and much stress ought not to be laid upon it, for the actual time consumed in the service—here it did not extend beyond an hour—is not, except in peculiar and extraordinary instances, a leading element in decreeing salvage compensation; indeed, the rate of salvage is not governed by the mere extent of labor. Further observations on or allusions to the main questions in this cause are unnecessary. Suffice it to remark that the services rendered by the Bramell and White were of superior merit, and equal in the result achieved; equal be their reward.

During the final hearing, counsel for respondents took the ground that there was no proof of ownership by the libellants, H. J. Dickerson and others. It was ruled in 4 Wash. 651, that if the facts alleged in the libel are not denied in the answer, they are not, therefore, to be taken as confessed. But the twenty-seventh admiralty rule provides that the answer shall be full, explicit, and distinct to each separate article or allegation in the libel. I am of opinion that the question of ownership should have been made *in limine*, by a negative plea, in the nature of a plea in abatement, in analogy to pleading in chancery; or by plea of no title or no property; or by denial in the answer. But if this view is found to be erroneous, the court can correct it by causing the money awarded to these libellants to be placed in the registry until the ownership is settled.

## DECREE.

It is ordered, adjudged, and decreed by the court that the defendants pay to the libellants, H. J. Dickerson and others, the sum of $700 for the salvage services performed by the steam tug-boat Bramell; and also pay to said libellants the sum of $200 for the salvage services of the steam tug-boat Forest City; and pay to the intervenor, the American Dredging Company, the sum of $700 for the salvage services of the steam tug-boat Mary T. White, and costs. The clerk, as assessor, will apportion each sum decreed upon the several interests at risk.

## END OF CASES IN VOL. 9