### SCOWS NOS. 1 AND 10.

#### (District Court, D. New Jersey. October 16, 1905.)

SALVAGE—COMPENSATION.

Mud scows Nos. 1 and 10, one loaded and the other unloaded, while being towed by the steam tug Samuel E. Bouker from near the lightship outside of New York harbor to Staten Island, were set adrift near Romer Shoals, a dangerous reef, by reason of the fact that the towline which attached the head scow to the steam tug was cut in two by the propeller of another steam tug which crossed it. The towline was cut and the scows left adrift about 4 o'clock in the morning. There was a dense low-lying fog at the time, which did not begin to lift until about 8 o'clock, and did not entirely clear away until between 10 and 11 o'clock; that because of this fog the Bouker was unable to find the scows; that about 7:15 o'clock the drifting scows were found and taken in tow by another steam tug, the John T. Pratt, and left at their moorings between 11 and 12 o'clock. The scows were without power or ability to signal or answer signals. A light southwesterly wind was blowing, which would naturally tend to drift them toward the Shoals. They were, furthermore, not far from the channel. *Held*, under the circumstances, that the scows were in some danger, but that the service rendered by the Pratt was of the lowest order of salvage, and that $250 would be allowed therefor.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Salvage, §§ 80–83.]

(Syllabus by the Court.)

In Admiralty. Libel for salvage.

Hyland & Zabriskie, for libelants.
Benedict & Benedict, for respondents.

CROSS, District Judge. In the early morning of May 4, 1905, two mud scows, Nos. 1 and 10, towed by the steam tug Samuel E. Bouker, were taken to the dumping grounds at or near the Scotland Lightship, outside of the harbor of the city of New York, for the purpose of being dumped. The signal to dump the scows was given by the tug at 20 minutes of two o'clock on the morning of the above date. One only of the scows was dumped. The captain of the other scow, being asleep, did not hear the signal, and consequently his scow was not dumped. The start to return was made about quarter after 2. The morning was very foggy. It was, however, a low fog, and smokestacks and masts of vessels could be seen above the fog at some little distance. On the return trip, when approaching Romer Shoals, the hawser connecting the tug with the tow was cut in two by the tug of another tow, which ran across the towline. The captain of the Bouker, by the sudden forward motion of his boat, knew that he had lost his tow, and

immediately turned about.    He was prevented, however, from going directly back to it by two other scows in tow of the tug which had cut his hawser, and also by still another tow following immediately in the wake of the former.  By the time these tows had passed, the captain of the Bouker had apparently lost his bearings in the fog, and consequently was unable to find the missing scows until later in the morning, and under circumstances to be hereafter mentioned.    His tow went adrift about 4 o'clock in the morning, and was picked up by the steam tug John T. Pratt about quarter past 7 o'clock of the same morning.    The Pratt was cruising at the time in the lower bay in search of business, and its captain having been informed that two scows were adrift near Romer Shoals, he went in search of and found them, so far as can be ascertained from the somewhat conflicting testimony, near Red Buoy No. 4, at the Romer Shoals.    At this time it appears that there was still a low-lying but dense fog, which, however, soon after began to lift, so that objects could be discerned at some distance, but it was not thoroughly clear until between 10 and 11 o'clock.    The sea at the time was quiet, and a light southwesterly breeze was blowing, which naturally tended to drift the scows toward the Romer Shoals.    The tide was approaching flood at this point, but the testimony shows that it continues to run flood for an hour and a half or more after nominal high tide, or at least that this amount of time elapses before the ebb tide is materially felt. The scows draw when loaded 9 or 10 feet of water, depending upon the character of the load, and when unloaded about 3 feet.    There is one point of the Shoals where the loaded scow might perhaps have grounded at high water in case the wind or tide carried it thither, and where at low water the loaded scow, and possibly both, would have grounded. These, in general, are the conditions under which the Pratt found the missing scows.    Each of the scows was at the time in charge of a captain.    The Pratt came alongside scow No. 1, which had been the first in line, and tooted its whistle, to see if any one were on board.    On one appearing, he and two of the crew then went aboard, and, according to the testimony, the captain knocked at the hatch to arouse any one who might be in the cabin, but whether this is so or not is immaterial.    The captain of scow No. 1 then came out, and was asked about the ownership of the scows and of the tug which had been towing them.    The captains of·the scows both say that at this time, and for some time previously, they had been able to see the smokestack and light boxes on the pilot house of the Bouker at some distance away, and that they asked the captain of the Pratt to signal for her to come and get them.    This testimony is, however, denied by the captain of the Pratt and the men who boarded the scow with him, and, considering all the testimony, I am constrained to disbelieve the testimony of the scow captains in this respect. They are not only contradicted, but contradict themselves, and are not supported by the testimony of the captain of the Bouker.    I do not believe the Bouker was at this time in the neighborhood of the drifting scows, but if their testimony were true, the further blowing of the Pratt's whistle would seem to have been useless, for if the captain of the Bouker was not attracted by the whistling to bring the man from the

hold of the scow, it is not to be presumed that he would have been attracted by further whistling. The Pratt thereupon made fast to the scows, and they were towed by it, with the aid of another tug subsequently called to its assistance, to Staten Island, where they were moored at the owner's wharf. The fog began to lift soon after 8 o'clock, but the Pratt, with the scows in tow, was approaching Staten Island between 9 and 10 o'clock, before the Bouker came up with it. The captain of the Bouker acquiesced in the situation and in the employment by the captain of the Pratt of the additional tug. He certainly made no request upon the captain of the Pratt to relieve him of his tow, or in any manner protested against his service, any more than did the men on the scows at the time the rescue was undertaken by the Pratt.

It is claimed on behalf of the respondent that there was no peril and no rescue; that, if the scows had been left to themselves, they would have drifted harmlessly until the fog lifted, when they would have been seen and taken in charge by the Bouker. I think this, however, is assuming more than is warranted by the circumstances. The scows were without power and without means of signaling or answering signals, and they were adrift near to dangerous shoals. The wind, such as there was, was from the southwest, and was blowing from a course which would tend to carry the scows upon the Romer Shoals. It cannot be said, under the circumstances disclosed, that the scows were in no danger; they were in some danger from that source, and, furthermore, they were, considering the fog and their proximity to the channel, dangerous to other craft and in danger from other craft. If I believed the testimony of the captains of the scows that they saw the smokestack and light boxes of the Bouker only 900 or 1000 feet away, that they called the attention of the captain of the Pratt to the fact before he took the scows in tow, and that he refused to notify the captain of the Bouker of the location of his scows, I would hesitate to permit the libelants to profit thereby to any extent whatever. As already stated, however, I do not accept that testimony, in view of its contradiction and apparent improbability. It is undoubtedly true, however, that the service rendered by the Pratt was of the lowest order of salvage. There was no danger whatever to the rescuing boat or to her crew. The sea was calm, the wind light, and the weather warm. The facts are not unlike those disclosed in the case of Hughes Bros. & Bangs Co., No. 49, 135 Fed. 746, 68 C. C. A. 384, with the exception that in that case the bay was full of ice and the weather bitterly cold; that two hawsers were broken on the receiving tug, and that one of the men had his hands frozen and sprained. I think, considering all the circumstances of this case, that a small amount of salvage should be allowed. There is some difficulty in ascertaining the exact period of time covered by the service, as the testimony is to some extent variant, but in my opinion four hours would cover its actual duration. I will allow libelants the sum of $250, which includes the amount paid to the captain of the tug assisting the Pratt.