THE GIBSON.

(District Court, S. D. New York. January 11, 1908.)

SALVAGE—RESCUE OF DERELICT—AMOUNT OF AWARD.
    A loaded coal barge, worth with her cargo in her salved condition about $20,000, was found and rescued by libelant's tug when about 50 miles off the New Jersey coast. She had broken her hawser and gone adrift two days before in a storm, and had later been abandoned by her crew. When found she had 12 to 13 feet of water in her, and would probably have sunk before receiving assistance from any other vessel. The service was attended with some danger to the tug, and considerable danger to the men who went on board, owing to her condition. *Held*, that the tug and crew were entitled to a salvage award of 50 per cent. of the salved value, to be distributed 75 per cent. to the vessel and 25 per cent. to the crew, those who went on board to be given an extra allowance therefrom.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 69, 93–95.
    Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit for salvage.

Robinson, Biddle & Benedict, for libellant.

Wallace, Butler & Brown, for claimant.

ADAMS, District Judge. This action was brought by Frank L. Neall, Trustee, as owner of the steamtug Sommers N. Smith, and on behalf of the members of her crew, against the barge Gibson and her cargo of coal, with the freight earned thereon, to recover salvage compensation for the saving of the barge, etc., at a point about 50 miles southeast from Absecon, New Jersey, about 8 o'clock in the morning of the 7th of February, 1907. The meritorious character of the salvage services is admitted, the dispute on that point being simply whether the libellant should recover one-half or one-third of the value, and what that value amounted to, the libellant contending that it was $27,000, and the claimant $18,246.64.

The Gibson left Newport News, Virginia, in tow of the tug Waltham with two other barges, the Darby and Bala, all laden with coal and bound for eastern ports. The Darby was the leading barge, the Gibson the second and the Bala the last. The hawsers between the vessels were long. When in the vicinity of Barnegat on the 5th of February, a storm was encountered and early in the morning, the two stern barges broke adrift and the tug attempted to continue on with the leading barge but she soon sank. The tug after manœuvring around for a time, looking for the other barges without success, proceeded to New York. The Gibson and the Bala remained fastened together a short time, when the hawser between them parted and the Bala subsequently sank. The Gibson after drifting nearly all day was picked up about 7 or 8 o'clock the same evening by the steamer Chalmette, bound to New York. The steamer made fast to the barge with hawsers, which parted after several hours' towing, when it being found that the pumps could not altogether resist the inflow of water from leaks in the vessel, she was left drifting upon the ocean, a hopeless derelict, if the bad weather continued. The master stated to the master of the Chalmette in the evening that she would not last till morning and asked to be taken off with his crew, which was done. The weather at the time was very rough; it was blowing a gale, with snow squalls and a choppy sea. The weather moderated in a short time, however, and the barge was not absolutely in a sinking condition, notwithstanding the quantity of water in her hold, which at the time was about 8 feet forward and 5 feet aft, she being somewhat by the head. Her seams, which had been opened by the heavy seas she had encountered, doubtless closed up so that she did not leak so badly thereafter.

The Smith, a tug about 150 feet long, worth about $40,000, and fitted with salvage appliances, was cruising on the 6th of February for a bark which she had heard was ashore. Not finding her, she went to the Delaware Breakwater, where she usually remained when not at work elsewhere, and found there a telegram from her owner about the barges, confirming information she had received from a schooner lying off Absecon, about one of them being still afloat. Having been ordered to seek it, she left the Breakwater about 10 p. m. of the 6th. She proceeded up the coast until Absecon Light was about 15 miles distant, bearing west-northwest, when she stood out to sea to the southward and eastward. She ran some hours that night, stopping toward morning on account of snow obscuring the

view. Some wreckage was observed, which it was supposed might indicate the loss of the remaining barge, thought to be the Gibson, but it was found to belong to another barge and when the snow ceased, the search was continued. About 7:30 a. m. of the 7th, the Gibson was sighted about 50 miles southeast from Absecon. The Smith ran up to her and found her lying in the trough of the sea, the wind being then to the northward and the barge heading to the eastward. The night had been very cold, the Smith's decks were covered with ice, and the barge also was almost covered. The barge was lying low in the water, so that her decks were practically awash amidships. The Smith endeavored to put some of her crew aboard by having them jump but it was deemed a dangerous attempt and it became necessary to lower a small boat in which the chief engineer and two deckhands went to the barge. There was a heavy sea running at the time and there was considerable danger to the boat and occupants from collision with the barge, particularly as there was no one on board to assist the rescuers. After some difficulty, however, the engineer and one of the hands got aboard while the other hand remained in the small boat. Those who went aboard discovered that the booby hatch leading down into the boiler room was open and that some water was finding its way thence into the body of the vessel as she rolled with the sea. This opening was on the port side of the vessel about 12 feet from her stem. It faced toward the stern and had upright sides and back a few feet high with a curved top or slide, which could be moved back. It had also a sliding upright door through which entrance could be gained to the boiler room of the barge, reached by means of the hatch companion-way covered by the hatch. Ordinarily the door was not used as the opening could be reached by climbing over the sides. When the crew left the barge, the top was pushed back but the door was in place. When the men from the Smith went aboard, the top was still open but the door was washed from its place into the engine room, thus giving access to the water from the deck through the door which otherwise would have been kept out. The quantity of water, however, which reached the hold was not very great, as it was only when the barge was in a position to facilitate it that the water gained an entrance. The other hatches were well secured and no water entered the hold except through the seams and the booby hatch. By the time the men went aboard, there had been sufficient leakage to increase the water in the hold to 12 feet forward and 13 feet aft and it was contended by the libellant that under the existing circumstances she would not have remained afloat for much longer than an hour. Of course that is a matter of conjecture but there can be no question that the barge was in serious danger and the possibility of her being picked up had not the Smith reached her was very remote. She was low in the water and taking some in, which in all probability would have continued, until she was sunk in deep water, especially considering that she had a sinking cargo on board. When the engineer reached the engine room and discovered the condition, he sent one of the men back to the Smith in the small boat for nails and canvas and with them, in conjunction with some boards found on the vessel, the

hatch was nailed up and that source of danger removed but not without some risk to the men because of the freezing weather and the heavy sea that was still running. As soon as this hatch was closed a line was run from the Smith to the barge and the former went ahead slowly, holding the barge's head to the sea. A fire was then started under the boiler and soon sufficient steam was available to start the engine when pumping commenced. The Smith then started to tow the barge to the Delaware Breakwater, during which she yawed considerably rendering the towage difficult. The Breakwater was reached about 3 a. m. of the 8th, thus occupying some 18 hours. After this the Smith stood by the barge to take care of her and protect her from the ice, until the 15th of February, when the claimant sent its own tug to tow her to New York, in which work the Smith assisted but has been paid for.

The first question for consideration is the rate of compensation to be allowed. .

It is contended by the claimant that the barge was still being sought for by the Waltham but the testimony shows that that tug, after arriving in New York about 11:35 p. m. of the 5th, at 6:35 a. m. of the 6th went out to look for the barges in the vicinity of Barnegat and Absecon, but did not go more than 5 or 6 miles from the beach and then she returned to New York where she remained until 10:35 p. m. of the 7th. In the meantime the barge had been picked up. If the Waltham had shown the enterprise, skill and perseverance displayed by the Smith, she might have saved the vessel, but as it was, her efforts to find the barge were entirely futile and it was left for the Smith to accomplish this very deserving piece of work.

The barge was unquestionably a derelict in the fullest sense of the word and was in great danger of becoming a total loss. While she may not have sunk within an hour, in all probability she would have done so before any assistance reached her. The services of the Smith were very opportune as well as skillful and attended with some danger to the tug in approaching the barge and getting her men aboard, but the principal consideration is that of the danger to the barge, which was imminent. The rescuing men on board were also subjected to considerable risk of being drowned in their efforts. Various authorities have been referred to by the claimant to sustain its contention for a 33 per cent. award but I do not consider them in point—The Theta (D. C.) 135 Fed. 129, seems to me to be the case most nearly similar to the present one and I refer to it and the authorities cited to sustain the 50 per cent. award which I deem it proper to allow here. In The Theta there are some features which do not appear in this case, that of removing a dangerous wreck from the path of commerce in approaching New York, for example, but that was a lumber laden vessel with a probability of there being some salvage from other vessels or beaching, while here the probability was that save for the Smith and her crew, the barge would have been a total loss. It does not seem necessary to point out and discuss the other differences. In fixing the award of 50 per cent., the master of the tug and the engineer who went on the barge should have an extra share of the 25 per cent. which is allowed to the crew of the tug. The other man who went to the barge's

assistance should have one-half of an extra share. Otherwise than as here indicated, the crew's shares will be allowed in proportion to their wages.

It remains to determine the value of the property saved. There were three items, viz.: the freight, the coal and the vessel.

The freight and charges amounted to $1,270.82. $300 were paid to the Smith for her services in assisting in the towage of the barge from the Breakwater to New York. One of the claimant's tugs which performed part of this service was entitled to as much. An aggregate payment of $600 was made to two of the claimant's tugs for towing from New York to Providence. $1,200 were therefore expended in earning the freight, leaving a balance of $70.80 subject to salvage.

The cargo consisted of 1412 tons, which cost, free on board, in Newport News $2.75 per ton. It was sold in Providence at $2.25 per ton on account of its damaged condition. Therefore the salvage value was $3,177.

The market value of the barge in her damaged condition would have been the basis for calculation for salvage purposes but the testimony shows that there is no market value for vessels of this description because they usually belong to coal transportation companies, which rarely, if ever, sell them but use them up in their business. The barge was built for the claimant at Bath, Maine, in 1898, at a cost of $23,941.01 including her whole equipment. During her entire life she had been used in the coal trade, a severe employment, involving the carriage of heavy cargoes, and somewhat rough usage. The value here may be fairly reached by ascertaining what it would cost to build a new barge of the same character and deduct such percentage of depreciation as might be due to her age and from the amount so found also deducting the cost of repairs due to the perils to which the barge had been subjected.

Nine witnesses were examined upon this controversy. They all agreed that there had been a marked appreciation in the cost of labor and material between the time the barge was launched in 1898 and February, 1907, when the salvage services were rendered, but their estimates of the advance varied from 10 to 50 per cent. Testimony that it amounted to the latter was given by two of the libellant's witnesses but it appears that their estimates were excessive. The preponderance of the testimony shows that 25% may be safely taken as the aggregate of the appreciation. Upon the basis of the cost of a trifle under $24,-000, which was a fair market value of the barge at the time, and allowing for the stated appreciation, she could have been reproduced in February of this year at a cost not exceeding $30,000. The testimony of nearly all of the experts on the subject confirms this estimate of value as indicated by the cost at the time of the salvage. A number of barges under construction at the time of the estimates, called "Class D," were referred to in the testimony but it appeared they were of somewhat different size from the Gibson, that they had additional strengthening through the use of iron straps and varied in other respects so that a comparison between those vessels and the Gibson does not lend much aid in reaching the desired result as to the latter's value. It appears that the Gibson required repairs on account of the stress she

had been subjected to of about $1,500. I conclude therefore that her value was her cost in 1898, $24,000, from which a reasonable deduction for depreciation for wear and tear of 5% per annum should be made. This would show a sound value in 1907 of $14,400, to which should be added 25% to represent the appreciation in cost of labor and materials showing a value in 1907 of $18,000, from which should be deducted $1,500, the cost of repairs. This would show a value of $16,500, which seems to fairly represent the damaged value, to be taken for salvage purposes.

The values therefore were:

| | | |
|---|---|---|
| Net freight | $ | 70.80 |
| Cargo | | 3,177. |
| Barge | | 16,500. |
| | | $19,747.80 |

There will be a decree for the libellant for $9,873.90 to be divided as above indicated.