### THE WHITE SEAL.

### THE LIZZIE CRAWFORD.

(Circuit Court of Appeals, Third Circuit. June 8, 1908.)

No. 27.

SALVAGE—RESCUE OF STRANDED LAUNCH—RIGHT TO COMPENSATION.

A tug, which found a naphtha launch stranded on a jetty in the Delaware river, having holes pierced in her bottom by the rocks and in danger of further injury, and, as she was apparently abandoned, all of her apparel and property having been removed, rescued and took her to port, was entitled to a salvage award, although warned by the owner and master, who came out in a boat, not to touch the launch; there being evidence to sustain a finding by the trial court that they did not advise the tug that they had any interest in her, and that the master of the tug was justified in supposing that they merely desired themselves to be the salvors.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, § 28.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 156 Fed. 201.

J. H. Brinton, for appellant.

Edward F. Pugh, for appellee.

Before DALLAS, GRAY, and BUFFINGTON, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from the decree of the District Court of the United States for the Eastern District of Pennsylvania, in admiralty. The cases, as stated, were founded upon the same facts and were heard together. These facts, so far as they were undisputed, are as follows:

About 3 o'clock in the afternoon of Sunday, June 26, 1904, the naphtha launch, or yacht, "White Seal," whereof McMasters was part

owner and master, was run upon a stone jetty at the lower end of Reedy Island, in the Delaware Bay. At the time, the yacht was in control of McMasters and one Lear, the engineer. Including these two, there were about sixteen persons on board, the others being passengers. The tide was low at the time, and as it was discovered that there were two holes toward the stern and under the engine, made by the rocks on which the yacht had run, all on board disembarked. Two anchors were put out to hold her from floating off when the tide arose. The whole party then went over in small boats to the Delaware shore, at or near Port Penn, carrying with them nearly all the movables and furniture on board. During the night a storm of wind and rain arose, and the boat pounded considerably on the rocks and filled with water. About 3 or 4 o'clock in the morning, the captain and engineer returned to the boat, and finding it in this condition, took everything movable out of her, including the binnacle, wheel, whistle, and all detachable parts of the machinery, and carried them ashore to the mainland. It is in testimony that, while on shore, either on the evening of the accident or the next morning, the captain and engineer had made arrangements with one Duncan, a lighthouse keeper near Port Penn, on the Delaware shore, to collect and take out casks and barrels, with which they expected to be able to float the boat off the rocks. During the forenoon of the next day, after the accident, while the captain and engineer were still on the Delaware shore, a mile or three-quarters of a mile away from the Reedy Island Jetty, the boat lay upon the rocks, with no one on board or near her.

George F. Murray, master of the tug "Lizzie Crawford" and libelant in the cross-libel, testifies that at about half past 11 in the forenoon, having heard from the Reedy Island Reporting Station that a yacht had run aground on the jetty and that no one was on board of her, went down to where the "White Seal" lay upon the rocks; that he went as near as possible, and he or his mate boarded her and found that she was stripped and full of water, and apparently abandoned; that with some difficulty he tried, as well as he could, to stop up the holes he found in her hull, by the use of bedquilts and other means, and fastening a short hawser to her bitts, so as to keep her from sinking, proceeded to pull her off. He testifies that at about the time he was pulling her off, or after he had gotten her off the rocks, a boat with two men in it appeared, and stopping some 75 or 100 feet away, hailed him; that he could not understand clearly what was said, but thought they asked what he was doing, and when questioned what they had to do with it, they, or one of them, replied, "Never mind, you'll see what we have to do with it, if you don't let that boat alone"; that they did not claim to be owners or make any protest as such against what he was doing, and that he thought they were perhaps fishermen, who were seeking a salvage for themselves. This testimony is, in the main, corroborated by that of his mate and of his wife. He then testifies that he towed the yacht across to a mud pen not far away, towards the Jersey shore, used by the government as a place of deposit for mud dredged out of the channel of the river and bay; that he did this in order to get a soft bottom on which the yacht might lie

until he secured the assistance of another tug to take her to Philadelphia. This assistance was obtained the next day from the tug "William J. Sewell," by whose steam pumps the yacht was pumped out sufficiently to get her into a sling, and she was thus carried between the two tugs to Camden, where she was delivered to her owners at a shipyard.

There is no serious dispute as to the facts thus summarized, except as to what occurred when McMasters and Lear, the engineer and master of the yacht, pulled out in a boat from the shore and approached the tug. They testified that, when the tug "Lizzie Crawford" came up, they were on the shore, waiting for the barrels or casks to be collected, which it was proposed to use in floating the yacht, by attaching them thereto when the tide was low in the afternoon; that they then rowed across to the jetty, about a mile away, thinking, perhaps, that the tug was employed by the insurance people; that they came alongside, or quite near to, the tug and held a conversation with the captain, stating that they were the owners, and protesting against the removal of the yacht by the tug, and that against their protest the yacht was taken to the mud pen, as described by the master and those on board the tug. This, of course, is the crucial point in the case, and if the testimony of the libelants for the yacht is to be believed, the conduct of the tug was an officious and unwarranted intermeddling with the property of the libelants, for which the tug should have been responsible. Libels were accordingly filed, respectively, by the owners of the yacht against the master of the tug, charging unwarrantable interference with and trespass upon their property, and by the master of the tug against the yacht, claiming compensation for a salvage service. By stipulation between the proctors for the several parties, it was agreed that the appeal filed on behalf of the yacht should be deemed to relate to both of said causes, and that they should be argued together, with like effect as if said causes had been consolidated.

The court below has dealt very fully with the testimony, which is somewhat voluminous, and the learned judge has made certain findings of fact, which, if accepted, are decisive of the issues involved. Among other things, he finds that on June 27th, the day after the accident, the master of the tug "Lizzie Crawford" heard of the condition of the yacht and went to her assistance; that when he arrived, he found the yacht with no one on board and stripped of all her apparel and movable property, and apparently abandoned; that she was resting upon the jagged rocks of the jetty while under water, and was in danger of receiving further injury; that at about the time he began the work of saving her, a party in a rowboat told him not to touch the yacht, but did not inform him as to their interest therein; that from what they said to the master of the tug, and the way in which they acted towards him, he could well conclude that they were parties who had no connection with the boat, and were simply interfering without authority. After stating the claims of the libel filed by the "White Seal," the learned judge proceeds:

"We, however, find that the master of the tug 'Lizzie Crawford' was not informed as to the character of the men in the rowboat at the time the

tug pulled the 'White Seal' off the jetty, nor had he any information as to their authority over the launch. He did no more than his duty in proceeding to save her from destruction, and we are not convinced that he could have done any thing better than to tow her to a place, with soft bottom, upon which she could rest until he could stop the leaks which she received upon the rocks. The master of the tug, however, discovered that the holes in the bottom of the vessel were under the engine and he was unable to get at them. He found it necessary to secure the services of another tug to tow the launch to Camden, where she was docked by her owners and repaired. The work of saving her was not at all dangerous, although it required continuous labor for about eight days. Because of the location of the injury to the launch it was necessary to employ the tug 'Sewell' to do some pumping, and to aid the libelant in towing the launch to Camden. It was necessary to tow the launch between the tugs 'Sewell' and 'Crawford' in order that she might be kept afloat."

Accordingly, the libel filed by the owners of the "White Seal" was dismissed, and to the libelant on behalf of the tug there was awarded $850.00 for salvage service, including the amount to be paid by said libelant to the tug "Sewell" for her assistance.

The case is not without difficulty, but we think, after a careful examination of the testimony, that while the master of the tug may have been somewhat officious in his conduct on the occasion in question, we should not do otherwise than give full weight to the findings of fact made by the learned judge of the court below. Those findings being accepted, we think the conclusion arrived at was correct, and the decrees below are therefore affirmed.