## THE D. L. CO. NO. XX.

### (District Court, W. D. Washington, N. D. May 9, 1913.)

### No. 2,258.

1. SALVAGE (§ 28*)—NATURE OF SERVICE—COMPENSATION.
    The picking up by libelant's steam schooner of a lumber-laden scow, worth with her cargo $8,000, in the Straits of Juan de Fuca, five miles from shore, where she had gone adrift two hours before by the breaking of her tow line, with no one on board, *held* a salvage service, but not of high order; the weather being calm, and the scow in no immediate danger, and it further appearing that she had not been abandoned by her tug, which had taken another tow to a mooring place and was returning. Libelant and the crew *held* entitled to an award of $250.
    [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 69, 71; Dec. Dig. § 28.*]

2. SALVAGE (§ 52*)—SUIT FOR COMPENSATION—COSTS.
    The action of a salvage claimant in libeling the salved vessel and cargo for $4,500, after refusal of its demand for $300, which was the full value of the service, *held* oppressive, inequitable, and an abuse of the process of the court, which warranted the taxing against it of four-fifths of the costs.
    [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 135–137; Dec. Dig. § 52.*]

In Admiralty. Suit by the Star Steamship Company for salvage against the scow D. L. Co. No. XX and cargo; the Seaton Barge Company, claimant. Decree for libelant.

Dorr & Hadley, of Seattle, Wash., for libelant,
C. H. Hanford, of Seattle, Wash., for claimant.

CUSHMAN, District Judge. [1] This is a suit for salvage of an alleged derelict scow and its cargo of lumber. It is now before the court on libelant's motion to confirm the findings of the commissioner, for a decree thereon, and upon the exceptions of the claimant to the commissioner's findings.

On the morning of September 18, 1912, the gasoline tug Margaret S., towing two barges loaded with shingles, was bound from Port Angeles, on the Straits of Juan de Fuca, for Seattle. About 4 in the morning, when some five miles west of Dungeness Light, the tow line of the trailing scow (L. D. Co. No. XX) parted. The tug took the other scow into Dungeness Bay, moored it, and immediately returned to get the scow left adrift. In the meantime, libelant's steam schooner Rapid Transit, loaded with shingles, out from Port Angeles, bound for Seattle, at a distance of several miles, sighted the drifting scow, estimated to be then about five miles off shore, with no one on board and no other vessel near it. The Rapid Transit went to the scow at 6:10

a. m., took it in tow, and proceeded towards Seattle, meeting the Margaret S. returning for it at 7:10 a. m.

The Margaret S. stood off, her captain claiming the scow. The captain of the Rapid Transit demanded that he "settle," saying he would take the scow to Port Townsend (towards Seattle) and settle there. The captain of the Margaret S. said he did not want the scow at Port Townsend, but wanted it at Seattle. The captain of the Rapid Transit understood this to be a request to take the scow to Seattle, which was done. Off Dungeness the towing line parted, and one of the boats of the Rapid Transit was stove in, in being taken aboard after replacing the line on the scow. After reaching Seattle, possession was retained by libelant. A demand for $300 salvage was made, which was refused. A tender of $50 was made, which was also refused, the scow retaken by claimant, and the libel filed herein, praying salvage to the amount of $4,500.

The commissioner to whom the matter was referred found that, at the time the Rapid Transit picked up the scow, the scow and its cargo were in danger of being lost, the scow was quasi derelict, and the service rendered was a salvage service, for which libelant should be allowed $1,000.

Libelant relies upon the following authorities: The Shawmut (D. C.) 155 Fed. 476; Cromwell v. The Island City, Fed. Cas. No. 3,410; The B. C. Terry (D. C.) 9 Fed. 920; The Lowther Castle (D. C.) 195 Fed. 604; Marvin on Wreck and Salvage, pp. 107, 108; The John Swan (D. C.) 50 Fed. 447; The Hyderabad (D. C.) 11 Fed. 757; Vincent v. The Penelope, Fed. Cas. No. 16,946; Kennedy, Law of Civil Salvage, pp. 8, 21, and note citing the opinion of Dr. Lushington, The Glascow Packet, 2 W. Rob. 306, at pp. 312, 313; The Eliza Lines, 114 Fed. 307, 52 C. C. A. 195; Hughes on Admiralty, p. 134; The Myrtle Tunnel (D. C.) 146 Fed. 324; The Gibson (D. C.) 160 Fed. 230; Earn Line S. S. Co. v. United States (C. C.) 170 Fed. 834; The Job H. Jackson (D. C.) 161 Fed. 1015; The Theta (D. C.) 135 Fed. 129; The White Seal, 162 Fed. 642, 89 C. C. A. 434; The Pinmore (D. C.) 121 Fed. 423; The Strathnevis (D. C.) 76 Fed. 855; The Ann L. Lockwood (D. C.) 37 Fed. 237–8; The Bee, Fed. Cas. No. 1,219; The Joseph C. Griggs, 12 Fed. Cas. 417; The John Shaw, Fed. Cas. No. 2,949; The Annie Henderson (D. C.) 15 Fed. 550; The Hughes Brothers & Bangs, No. 49, 135 Fed. 746, 68 C. C. A. 384.

Respondent relies upon the following authorities: The H. B. Foster, Fed. Cas. No. 6,291; Crowell v. A Chain and Anchor, Fed. Cas. No. 3,443; The Cleone (D. C.) 6 Fed. 517, 7 Sawy. 77; The Emulous, Fed. Cas. No. 4,480; The Attacapas, Fed. Cas. No. 637; Bean v. The Grace Brown, Fed. Cas. No. 1,171; The Viola (C. C.) 52 Fed. 172; Murray v. United States, 55 Fed. 829, 5 C. C. A. 283; The Ragnarok (D. C.) 158 Fed. 694; The Lee (C. C.) 24 Fed. 47; The Pocomoke (D. C.) 173 Fed. 94; The Launberga (D. C.) 154 Fed. 959; The S. C. Schenk, 158 Fed. 54, 85 C. C. A. 384; The Boston, Fed. Cas. No. 1,673.

Claimant relies upon certain of the authorities cited by respondent, and, in addition, upon the following: Desty's Shipping & Admiralty,

§§ 312, 322, 326; The Champion, Browning & Lushington Adm. Rep. 69; The Union Express Co., Fed. Cas. No. 14,363; The Thomas Hunt, Fed. Cas. No. 13,326; The Senator, Fed. Cas. No. 12,664; Raft of Spars, Fed. Cas. No. 11,529; Muntz v. Raft of Timber (C. C.) 15 Fed. 555; The James A. Rumsey (D. C.) 40 Fed. 909; The City of New York (D. C.) 184 Fed. 478; Hume v. Spreckels, 115 Fed. 51, 52 C. C. A. 645; In re Scows Nos. 1 and 10 (D. C.) 141 Fed. 477; Neel. v. Iron City Sand Co., 149 Fed. 980, 79 C. C. A. 490; The New Camelia, 105 Fed. 637, 44 C. C. A. 642; The Brina P. Pendleton (D. C.) 200 Fed. 848.

The testimony is of a contradictory character regarding the state of the sea and the danger therefrom to the scow and its cargo. The evidence fails to show that the scow was in any substantial danger. It had not been abandoned by the Margaret S. The point where the scow was picked up by the Rapid Transit is about 70 miles from the ocean in the Straits of Juan de Fuca. The report of the weather observer at Port Crescent, less than 25 miles away, shows that for 18 hours preceding 6 o'clock a. m. on September 18, 1912, the wind was blowing from the west and northwest, varying from 2 to 6 miles an hour. There was nothing in the situation to warrant the inference that it had a greater or other velocity at the point in question. The captain of the Albion, a passing steamer bound for Port Angeles, who appears to have been a wholly disinterested witness, testified that the ports of the Albion were open, which would not have been the case if the weather was bad. He did not consider the sea rough or dangerous.

The scow and its cargo were in good shape when picked up. A westerly swell was coming in from the ocean. There is considerable dispute in the testimony as to how heavy it was. If danger was likely to occur to the scow and its cargo while lying in the trough, or broadside to the swells, no reason appears why it would not have occurred during the two hours it was adrift. None of the shingles were lost, and a lantern was still standing upright, unsecured in any way, on the top of the shingles. It is probable that both tow lines were broken by the tide rips, although the swells would tend to vary the tension on them. Both the wind and tide were with the vessels and their tow. One of libelant's witnesses testified that the scow was in the tide rips when the Rapid Transit picked it up. There was but slight danger in the services rendered, and it chiefly, as shown by the event, to property and not life—a towline being broken and a rowboat damaged.

The fact that the scow was found adrift early in the morning, with no one on board and the lantern unlighted, would justify an inference that it had been lost during the night, that the owner might not find it, and that, unless taken in charge by the Rapid Transit, or some other passing vessel, the scow might, eventually, be lost or damaged, resulting either from a change in the weather, collision with passing vessels, or being set upon the beach by the swells. These circumstances justify the finding that the services rendered in taking the scow in tow were done in good faith and constituted neither a trespass nor unwarranted intrusion.

From the time the Margaret S. demanded the scow, the service was merely a towing service. Clearly the captain of the Rapid Transit was justified in considering the statement of the captain of the Margaret S. that he wanted the scow in Seattle as a direction or request to him to take it there, especially so in view of the latter's conduct in standing off from the Rapid Transit and not insisting upon anything more definite, but appearing to acquiesce in what was done. On account of the services rendered, the Rapid Transit was delayed 6½ hours in reaching Seattle.

The following findings of the commissioner are confirmed:

Value of the Rapid Transit, $9,000; value of its cargo, $2,000.

Value of the scow, L. D. Co. No. XX, $4,000; value of its cargo, $4,000.

That the officers and crew of the Rapid Transit consisted of the following named persons, with the following monthly compensation:

Howell Parker, master.............................$110 per month.
John Matsen, mate................................. 90 " "
William Marmont, chief engineer................... 110 " "
A. Olsen, second engineer......................... 80 " "
John Sims, quartermaster.......................... 45 " "
Ole Haverson, deckhand............................ 40 " "
A. McDonald, deckhand............................. 40 " "
Ole Snortland, deckhand........................... 40 " "
P. Barnes, deckhand............................... 40 " "
P. Stalt, deckhand................................ 40 " "
W. Gardner, deckhand.............................. 40 " "
W. Jannenberg, fireman............................ 45 " "
Henry Holman, fireman............................. 45 " "

It is found that the compensation recommended by the commissioner for the services rendered is excessive. It is further found that the libelant is entitled to $250 for such services—the officers and crew of the Rapid Transit, each, to receive therefrom an amount equaling their regular pay for three days.

[2] In view of the character and amount of service rendered, the conduct of libelant, after having demanded a salvage charge of $300, in libeling for $4,500, which required the furnishing of a bond for $9,000 by claimant, was oppressive, inequitable, and an abuse of the process of the court, for which it is determined the libelant shall pay four-fifths of the costs of the proceedings.