## THE VIOLA.

## MURRAY v. UNITED STATES.

### (Circuit Court of Appeals, Third Circuit. May 17, 1893.)

### No. 8.

1. SALVAGE—EXTRAORDINARY TOWAGE—EVIDENCE.

A light-ship was broken from her moorings off the coast of Delaware, and driven before the wind 130 miles southward. She was a new vessel, schooner-rigged, well-provisioned, fully equipped and officered, and had a crew of six men. She displayed no signals of distress, and refused assistance from passing vessels, but afterwards signaled for a tow. She was taken in tow during mild weather by the sugar-laden steamer V., bound from Matanzas to New York, who carried her inside of Cape Henry, neither vessel sustaining injuries of any consequence, and the V. incurring no risks to property or lives, and but trifling expense. There was evidence to show that the light-ship was at no time in serious danger. *Held,* that the V. was not entitled to salvage. 52 Fed. Rep. 172, affirmed.

2. EXTRAORDINARY TOWAGE.

In such case the V. was entitled only to extraordinary towage, and, as she was detained two days, and her value was $250,000, while the value of the light-ship was $50,000, the sum of $2.500 was a sufficient allowance for her services. 52 Fed. Rep. 172, affirmed.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

In Admiralty. Libel by Lawrence Murray, master of the steamship Viola, against the United States, for salvage. The court below held that the service rendered was not a salvage service, but gave libelant a decree for $2,500 as for towage. 52 Fed. Rep. 172. Libelant appeals. Affirmed.

John F. Lewis and Curtis Tilton, for appellant.
Robert Ralston and Ellery P. Ingham, for the United States.

Before ACHESON and DALLAS, Circuit Judges, and WALES, District Judge.

WALES, District Judge. This is an appeal from a decree of the United States circuit court for the eastern district of Pennsylvania, refusing the libelant's claim for salvage, and allowing inadequate compensation for towage services. Eight assignments of error have been filed, but all of them may be included in the second and third, which are as follows:

"(2) In holding that the services rendered by the Viola to the light-ship were extraordinary towage services, and in not holding that said services were salvage services, and so compensating them. (3) In not awarding adequate compensation for said services, and in not awarding interest upon the sum allowed from the date of said services."

The history of the case is this: At 5 o'clock on Sunday morning, April 7, 1889, during the height of a northeast storm, the winter quarter light-ship, No. 45, broke loose from her moorings, off the coast of Delaware, about 25 miles from Chincoteague, and was driven before the gale 130 miles southward from her station.

She was a new vessel, schooner-rigged, well-provisioned, and fully equipped with sails, boats, and anchors, and was in charge of an assistant keeper, an assistant engineer, and a crew of six men, including the cook. The first keeper and the chief engineer were ashore on leave. Immediately on breaking loose, the chains were hauled in, the jib and foresail were put up, the vessel was hove to, and a color set, showing that she was adrift. It was not long before the steamer Richmond, of the Old Dominion Line, passed No. 45 within short hailing distance, but no signal of distress or for assistance was made by the latter, and the Richmond saluted and went on. The expectation was that the Richmond would, on reaching port, report the position of No. 45. On Monday night, the 8th, between 8 and 9 o'clock, the steamer Chattahoochee, of the Ocean Steamship Company of Savannah, came in sight, and, in answer to a flashlight on board of No. 45, circled round the latter, to ascertain what was wanted, and, on finding that a tow was required, Capt. Daggett replied that he had not sufficient coal for the purpose, but would lay by until daylight to take off the officers and crew, if necessary. The officer in charge of No. 45 replied: "No, I don't want to be taken off. Go on." At 6:30 A. M. on Tuesday, the 9th, the large freight steamer Viola, sugar laden, bound from Matanzas to New York, came up, and, in response to a signal from No. 45, "Will you take me in tow?" the steamship signaled, "Wait till the weather moderates." Later in the day the Viola made an offer of provisions, which was declined. In the mean time the Viola kept No. 45 in sight, and at 5 o'clock A. M. on Wednesday, the 10th, the sea having fallen considerably, the Viola got out a boat, passed a small line to No. 45, and by that means hauled a seven-inch hawser on board. The Viola next sent her hawser and made fast to No. 45, and at 8 A. M. "let away with full speed, towing with two hawsers." At 6 A. M. on Thursday, the 11th, No. 45 was brought into Cape Henry, and left in charge of a tug, the Viola proceeding on her voyage to New York. The log of the Viola contains this entry for Wednesday: "Noon. Latitude 36 deg. north; longitude 74 deg. 27 min. west; distance twenty-eight; steering northwest by west; speed about seven knots; weather fine. 4 P. M. Light northwest wind and fine clear weather." This was the day on which the towing began. The storm which drove No. 45 from its station had set in on Saturday night previous, and continued with great violence during the two following days. On Tuesday it had spent its force, the wind backing to the north-northwest, and the sea having fallen. During this time No. 45 rode out the gale without loss or damage, save such as were repaired at the small cost of $41.50. Neither did the Viola suffer any injury, save a chafed hawser, which was afterwards condemned, and possibly a leak in the lazaretto, near the rudder post, which was not at all serious, and was not repaired until after she had returned to the West Indies; and no witness was able to tell whether the leak was developed before

or after the Viola fell in with No. 45. The chief engineer of the steamship could perceive no strain on her engines after the towing began; and as to the alleged risk to the lives of the men who passed in the small boat between the two vessels in carrying out the lines attached to the hawsers the evidence conclusively shows that it was nothing more than the usual risk which always attends such work in mid-ocean, and is not accounted dangerous by experienced and active sailors.

The claim for salvage was urged on the ground that No. 45 was in charge of incompetent officers, with an inexperienced crew on board, was unmanageable, and at the mercy of the winds and waves. It is true that the vessel had no skilled navigator, but her officers and men were practical seamen, and there is ample testimony to prove that she was ably handled throughout the prevalence of the storm; and the indisputable fact that no signal of distress was made, and the refusal of the officers to accept an offer of rescue from the Chattahoochee, confirm the belief that those in charge of her did not consider themselves or the vessel to be in imminent peril. The entry in the log of the Viola for Tuesday, the 9th, is: "This day begins with strong north-northwest gale and clear weather; sea moderating; steering north by east; speed about two knots an hour. At 4 A. M. wind and sea moderating. 6:30 A. M. Sighted winter quarter light-vessel under small sail, hove to."

The main sail of No. 45 was not bent, and it was attempted to be shown that she could not be hove to without it, but this is disproved by the extract from the Viola's log, and by the statement of Capt. Daggett, of the Chattahoochee, who says that the light-ship was ably handled, reversing his courses while the captain was steaming round him, hauling his head up to the sea, and laying in a very comfortable and easy position. By that time (Monday night) the height of the gale, according to Capt. Daggett, had passed, and was moderating very fast, but there was still a very heavy sea. Mouat, chief officer of the Viola, admitted that if he had been on No. 45, with plenty of food and water, he would have considered himself safe, but would have kept along the land, so that some one might pick him up. He qualifies this admission, however, by saying that if he was not a practical seaman, and no practical seaman was on board, he would think his time had come. Nelson, the second officer of the Viola, also admits the possibility of No. 45 pulling through the gale, provisioned and manned as she was, and he could not say that she was not carefully managed. Capt. Murray thinks that No. 45 could have sailed with a fair wind, and that on the night before the towing began there was nothing dangerous in her position. Commander Read, of the United States navy, who was the inspector of the fourth lighthouse district in 1889, and investigated the facts connected with the accident to No. 45, immediately after its occurrence, found that everything had been done to his satisfaction by the officers and crew as far as handling

the ship was concerned. It was the object of her officers to head the vessel to the eastward, and keep her away from the land. It was also his opinion that they could have sailed up to or near their position, off Chincoteague, if they had not been taken in tow. He further testified to his belief in the competency of her officers and men.

A careful review of the evidence has convinced us that the services performed by the Viola do not support a claim for salvage. The ingredients of a salvage service are: First, enterprise in the salvors in assisting a vessel in distress, risking their own lives and property to save the lives and property of others; second, the degree of danger and distress from which the property is rescued,—whether it was in imminent peril, and almost certainly lost if not at the time rescued and preserved; third, the degree of labor and skill which the salvors incur and display, and the time occupied. Where all these circumstances concur, a large and liberal reward should be given; but where none, or scarcely any, take place, the compensation can hardly be denominated a salvage compensation; it is a little more than a mere remuneration pro opere et labore. The Clifton, 3 Hagg. Adm. 121; Tyson v. Prior, 1 Gall. 133. The towing of No. 45 into Cape Henry, a distance of 120 miles, was unattended by any unusual peril or risk; nor was any danger incurred by the Viola in laying by No. 45 from Tuesday morning to Wednesday morning. There is also some force in the argument that the light-ship signaled for a tow, and at no time hoisted any signals of distress; and that, the request for a tow having been accepted by the Viola, it constituted an implied contract for towage, to be paid for as such; and that no claim for salvage could arise unless the tow was in imminent peril at the time, or became disabled and in distress from causes occurring after the towage had begun. The Kingaloch, 26 Eng. Law & Eq. 596.

The value of the Viola and her cargo was $257,000; the value of No. 45 was $50,000. The Viola's service was highly meritorious, and may be classed under the head of extraordinary towage, but it did not reach the grade of a salvage service. Her deviation from her regular course was not great, and at Cape Henry she was nearer to New York than when the towing began. She assumed a possible risk of endangering her insurance, but with this exception she incurred no greater risk than she would have incurred had she kept on her direct course, save the danger of ordinary towage. The only question in Capt. Murray's mind in considering the request for towage was whether he had enough coal to carry him through, and, on being satisfied that the supply was sufficient, he decided to take the light-ship in tow. The circuit court allowed $2,500 for this service, and we think that amount was sufficient to cover all the items for detention, extra consumption of coal, the extraordinary towage service rendered, and interest.

The decree of the circuit court is therefore affirmed.