## THE SPOKANE.

### McGRAW TRANSPORTATION CO. v. THE SPOKANE.

(District Court, E. D. Wisconsin. April 17, 1895.)

ADMIRALTY—SALVAGE.

> The steamship S., while navigating on Lake Michigan, at the close of the season, and when storms were to be expected, broke her shaft, and thereby became disabled, having no sails. Neither her position nor the conditions of the weather at the time threatened any immediate danger, but the barometer was falling, indicating the approach of a storm. The steamship V., passing on her course, responded to the signals of the S., and at the request of the master of the latter took her in tow for a port where she could be repaired. During the following night a storm came on which caused some trouble in the towage, but no extraordinary difficulty or great danger. On the afternoon of the day following that when the S. was taken in tow, the two steamers reached a port, where the S. was left in charge of a tug. The V. suffered no injury except a delay of 22 hours. The value of the S. and cargo was $320,000, and of the V. $125,000. *Held*, that the service rendered by the V. was a salvage service, but not of the highest order, and that an allowance of $3,600 was proper.

This was a libel by the McGraw Transportation Company against the propeller Spokane for salvage.

This libel was filed by the owner of the propeller City of Venice for salvage services in releasing from peril on Lake Michigan the propeller Spokane and her cargo of general merchandise, and towing to the port of Milwaukee for repairs. The City of Venice was a freighting steamer, registering 1,771 tons, and laden with coal, bound for Chicago. The Spokane was a steel steamer, and also a freighter, of about equal tonnage, bound from Chicago to Buffalo, stanch and well manned and equipped. The Spokane left Chicago December 9, 1894, for her last return trip of the season. On December 10, at 9:55 a. m., her shaft broke, leaving the vessel without motive power, as she was not provided with sails. At the time of this disaster she was on her course, 12 to 15 miles off the east shore of Lake Michigan, about 8 miles north of the port of Manistee, and about 40 miles south of the South Manitou Island. Her position was only a few miles south of Point Au Becs Scie, where the courses join of vessels bound south by either the outer or inner passage of the Manitous, and there diverge for Milwaukee and Chicago. The master knew that several large steamers were then about due at that point, bound down for those ports; that their courses would bring them in sight, and one of them might be expected soon. Preparations were thereupon made for a tow; a new 10-inch hawser which was on board was placed in readiness, and a flag of distress was raised. Excepting her inability to navigate, the Spokane was in every respect seaworthy, and in no imminent peril; there was no sea running, an off-shore breeze prevailed, there was deep water, a good shore, and she was well supplied with ground tackle; a small boat could be safely sent to the shore to wire for assistance, but it does not appear that a sufficient tugboat could be obtained from any port nearer than Milwaukee. The testimony shows that there was a falling barometer at the time the assistance in question was rendered, betokening the storm of rain and wind which came that night. The City of Venice, on her course for Chicago, sighted the Spokane about noon of the 10th, bearing a trifle on her starboard bow; the Spokane gave the distress signal of four blasts of her whistle, in addition to the flag signal, whereupon the Venice was promptly headed for her, coming within hail at about 12:40; was informed of her disabled condition, and asked to stand by and give her a tow to Milwaukee for repairs. There is some variance with regard to the expressions used by the master of the Spokane,—whether he was urgent that the Venice should not leave them, and whether the port of Manitowoc was mentioned, and rejected because

not having sufficient water for safety,—but it is undisputed that assistance was requested for the helpless steamer, that no terms were asked for, suggested, or imposed, and that the help was prompt, voluntary, and meritorious. The Venice was fortunately provided with a tow post, although not engaged in the business of towing. The hawser of the Spokane was taken aboard without difficulty, and the tow headed for Milwaukee, with the wind freshening, and towards night the weather thickened, with rain. Good progress was made, without serious difficulty, for about 70 miles, on a southwesterly course, until about 10 o'clock that night, when, the wind having increased to about 20 miles an hour, or more, with a heavy sea running, and the vessels approaching the west shore, then distant about 15 miles, the master of the Venice deemed it prudent to put about head to the wind. This maneuver was successfully accomplished, and they were so headed eastward, under check, until 6 a. m. of the 11th, when the signal was given by the Venice for the turn southward. There is some dispute in relation to the signals for this move, but it is sufficient that in some manner the check at the bow of the Spokane, through which the line led, was pulled out, and the hawser was cut by the steel stanchion, and parted. The hawser was hauled in by the Venice, was passed again to the Spokane, after two ineffectual attempts, and the tow resumed. Milwaukee was reached without further incident, about 5 p. m. of the 11th, and, the Spokane being left outside in charge of a tug, the City of Venice proceeded to Chicago, having suffered no injury from her service, except a delay which the master states at 22 hours. The repairs to the Spokane were completed the next day, and she proceeded on her voyage. There was much testimony with reference to the violence of the storm, but it is apparent that it was not more dangerous than those which often occur on the Great Lakes late in the season, and through which like tows are conducted with safety. The circumstances required skill, special watchfulness, and judgment beyond that of ordinary navigation without a tow; but, with the exercise of good seamanship (which was here shown), cannot be considered as involving the towing steamer, or probably either steamer, in imminent peril. The libelant places much stress upon the fact that navigation closes nominally with the month of November, when regular insurance terminates, with a margin of five days; but it was well shown that practical navigation, especially with steam vessels, has extended far into December in later years; that, for several days in the month in question beyond the time of the accident, a large number of steam craft were plying on Lake Michigan, and around the lakes; that several steamers of similar class with the Spokane were actually in the vicinity, bound down, and closely following the Venice; that one, the Frontenac, came in sight soon after the line was taken; that another, the Charlemagne Tower, Jr., owned by respondent, reached the place of accident about 5 p. m. The agreed estimate of valuation of the Spokane and her cargo was $320,000. The valuation of the City of Venice was $125,000. The libelant claims that it "is entitled to a salvage compensation equal to one-fifth of the gross value of the property saved"; but is willing to accept, and insists upon, $15,000. The respondent contends that the allowance should be for a towage service only, or, at the utmost, "a salvage service of the lowest order of merit." It was testified that the expense of a tow in that weather, by a competent tug summoned from Milwaukee, would have been about $600.

Van Dyke & Van Dyke and J. C. Shaw, for libelant.

C. E. Kremer and H. D. Goulder, for claimant.

SEAMAN, District Judge (after stating the facts as above). The libel and the answer in this case differ mainly in their statements of the degree of peril or of comparative safety encountered in the towage to Milwaukee. The testimony was heard in open court, and I find no substantial contradictions in matters material to a decision. It is apparent both that the libel states the conditions in some respects in terms of exaggeration, and that the answer

tends to belittle the actual merits and difficulties of the undertaking. A version about medium between them is made out by the testimony.

There has been much discussion by the courts in attempted distinction of cases of mere towage from those of salvage, and in some a classification of "extraordinary towage" has been adopted. A notable instance of the latter distinction is found in The Emily B. Souder, 15 Blatchf. 185, Fed. Cas. No. 4,458, where Chief Justice Waite at the circuit reduced the amount decreed by the district court from $3,000 to $1,000; and the fact that the master of the assisting vessel did not give notice before taking the towline that he would claim salvage remuneration (although his steamer was thereby taken entirely out of her course, and put to expense and inconvenience) was mentioned as one of the reasons which made the service towage, and not salvage. In that case it appeared, however, that the assisted steamer, deprived of her steam power, had the use of her sails, had made fair progress, and within 24 hours would probably have reached the vicinity of her port; that she gave no signal of distress, but sought to have a charge fixed for towage. These circumstances and the absence of actual peril were evidently taken to deprive the service of the character of salvage, and the comment upon the want of any demand or assertion as a salvor is only referred to in connection with those facts, and cannot be understood to make notice or demand a prerequisite for salvage, or that its absence would count, of itself, as a circumstance against the claim. Indeed, the rule is stated the other way,—that, in the absence of a definite proposal or arrangement, where a vessel in distress calls upon a passing vessel for help, salvage compensation is implied. The Louisa Jane, 2 Low. 295.[1] The distinction of meritorious volunteer service as towage rather than salvage appears in the cases of The Viola, 52 Fed. 172, and, on appeal, 5 C. C. A. 283, 55 Fed. 829, and The Leipsic, 5 Fed. 108, and, on appeal, 10 Fed. 585. On the other hand, the current of decisions would generally designate the services rendered by a volunteer, owing no obligation of contract or duty, in saving a vessel from peril or distress, as salvage, or in the nature of salvage, and entitled to remuneration as such. Salvage is defined by Justice Bradley in Sonderburg v. Tow Boat Co., 3 Woods, 146, Fed. Cas. No. 13,175, to be "a reward for meritorious services in saving property in peril on navigable waters, which might otherwise be destroyed, and is allowed as an encouragement to persons engaged in business on such waters, and others, to bestow their utmost endeavor to save vessels and cargoes in peril." It is the fact of peril, and not its extent, that gives foundation for salvage. It is sufficient if it be "something distinctly beyond ordinary danger,— something which exposes the property to destruction unless extraordinary assistance be rendered." 2 Pars. Shipp. & Adm. 282. And it is not essential that escape by other means be impossible. Talbot v. Seeman, 1 Cranch, 1; The Connemara, 108 U. S. 352, 2

[1] Fed. Cas. No. 8,532.

Sup. Ct. 754; Coffin v. The John Shaw, 1 Cliff. 230, Fed. Cas. No. 2,949. The importance of the distinction of salvage service from mere towage, or from any service governed by contract or legal duty, lies in the difference in the basis and measure of recovery. In salvage the allowance is made by way of reward, and is not limited by the rule of quantum meruit; while the recovery for all other services is limited to the measure of the contract, or pro opere et labore. But the amount of salvage allowance is always dependent upon the consideration of all the circumstances, the extent of maritime peril averted, the risk incurred, the heroism exhibited, and the value of the property salved. Therefore, the courts recognize different degrees of merit in salvage; and for the higher order,—for example, cases of derelict, or cases involving extreme risk,—the reward is usually a share or proportion of the value of the salved property, while in the lower orders the idea of reward is preserved, but is not proportioned to the value; and, when the risk is inconsiderable and the service slight, the allowance "is little more than a mere remuneration pro opere et labore." Macl. Shipp. (3d Ed.) 619; The John E. Clayton, 4 Blatchf. 372, Fed. Cas. No. 7,338; The Bolivar v. The Chalmette, 1 Woods, 397, Fed. Cas. No. 1,611. In the case at bar I find no difficulty in placing the service, upon the undisputed facts, within all well-considered definitions of salvage. The Spokane was found in the open waters of Lake Michigan, entirely disabled in her motive power, and helpless to reach any port for refuge or repair, at the close of the season, when severe storms were to be apprehended, and when a falling barometer indicated a storm pending; she was flying the signal and sounding the whistle of distress. In response thereto, the City of Venice, bound for Chicago, headed for the Spokane, and, on information of her condition, promptly took her line and towed her to Milwaukee. The passage with such a tow, and in the heavy sea and thick weather which came upon them, was difficult, although not of extreme danger; the service was meritorious, and entitled to reward in the nature of salvage. It is equally clear that this salvage service was not of the higher order, and is not entitled to remuneration based upon a share or percentage of the value of the Spokane and cargo eo nomine.

The delicate and difficult question remains to determine an amount for this salvage which shall not only recompense the service, but shall be a just reward for it, and shall also serve as an encouragement of others to like action. At the same time, the court ought not to impose more than should be justly paid by the respondents in view of the extent of peril from which the vessel and cargo were rescued, or an amount that would constitute a precedent discouraging vessels in distress or peril from invoking and accepting necessary aid. In the quest of light for this determination, I have examined all the cases cited by counsel, and many additional. Each case depends, for the allowance made, upon its particular facts, and the view taken by the court of the conditions and surroundings. A review of them, pointing out distinctions, would extend this opinion unnecessarily. I deem it sufficient to

note that the conditions affecting navigation upon the Great Lakes differ in many respects from those which prevail upon the ocean and its dangerous coasts; that cases from the seaboard, having in view the perils there encountered, and the fewer chances of rescue, all tending to swell the rewards for salvage, are not wholly applicable here for guidance in fixing the amount. For example, in The Alaska, 23 Fed. 597, a great Atlantic liner, carrying hundreds of passengers and a valuable cargo, lost her rudder in mid-ocean, was helplessly drifting, and liable to be taken out of the course of travel, when the saving assistance was rendered. The case of The Egypt, 17 Fed. 359, explains the need of a large salvage allowance by reason of the peculiar dangers of the South Atlantic coast. In The Kenmure Castle, 5 Asp. 27, the rescued steamer was upon the Red Sea with a broken shaft, in treacherous waters lined with coral reefs, and required towage for several days before reaching a port. Upon these Lakes commerce has assumed vast proportions; vessels up and down pursue a regular and well-defined course, often within sight of shore, and in case of distress are not liable to remain long out of sight of other vessels; the newspapers publish the fact of passing Detroit and other points, so that the progress and position of all vessels are approximately known; good harbors are frequent; the towage of large vessels, barges, and rafts has become a feature of this navigation, and only storms of the utmost severity are regarded as dangerous to such undertaking. The allowance for salvage must be made in conformity with these modified conditions. There are few reported decisions in reference to salvage service on the Lakes; none has been cited justifying the allowance claimed by the libelant. I am satisfied that it would not subserve the public interest, and would not be just between the parties to allow so large an amount for salvage under the circumstances shown. I am greatly aided to the conclusion reached by a precedent cited from the records of this district in a decree entered by Judge Dyer, October 6, 1879, and affirmed by Judge Drummond on appeal. It is the case of The Ensign v. The Peerless, Fed. Cas. No. 4,494, for salvage services, which was thoroughly presented and contested by eminent proctors. Unfortunately, there does not appear in the record any written opinion by either judge, but upon the conceded facts the decrees give an unmistakable expression of their views. The Peerless was a large steamer, navigating the waters of Lakes Michigan and Superior, carrying passengers and freight. She left Manitowoc, on the west shore of Lake Michigan, bound for Lake Superior, on the night of September 1, 1877, with 50 passengers and heavily laden with merchandise and live stock. While in mid-lake, and out of the usual course of steamers, at about 4:40 a. m., her air pump broke, disabling her motive power, and the water rushed in through the discharge pipe, threatening to sink the vessel; much freight was jettisoned (including cattle and other live stock, and flour), to lighten the vessel, and to cause her to list over, and bring the leak above water. This was successful, and the hole was temporarily plugged, "filling up with blankets and flour to stop the water." She was for the time being disabled and

in danger, and put up distress signals. There is dispute over the question whether she could have been put in condition to navigate, and with reference to the violence of the wind and the sea. It is clear, however, that the vessel called for and needed assistance, and that there was much panic among the passengers, if not on the part of the crew. The freight propeller Scotia hove in sight (claiming to be out of her course because of the gale), and, discovering that the Peerless was in distress, went to her assistance, and was requested to take her to the harbor at the Manitou Islands. The line was promptly taken, and she was towed to that harbor, a distance of about 45 miles, occupying about nine hours, without serious difficulty, aside from a stormy passage. The libel states the value of the Peerless at $118,000, and her cargo at $50,000, and that she had about 50 passengers and her crew; the answer states her value at $60,000, and the cargo at $27,000, The Scotia was of about the same value. The actual worth of the service as towage would have been $500 to $600, according to the testimony; $15,000 was claimed as salvage. The decree pronounced the service one of salvage, and allowed $2,000. The libelant appealed, and the decree was in all respects affirmed. In the present case it is undisputed that the shaft of the Spokane could not be repaired until she reached a port; in this respect the Peerless may have been in better condition, but the danger to the Peerless was more imminent. The Spokane, however, required towage for a greater distance; the passage was rougher and more difficult; the season was at its close, when a sudden and violent storm was to be apprehended; the values of all the property at risk were much greater. The compensation here should be larger. As $600 would probably have been a fair charge for the towage alone, there will be added to that the sum of $3,000, making an allowance of $3,600 for salvage, for which amount I decree for the libelant, with costs.