THE BRINA P. PENDLETON.

(District Court, E. D. North Carolina. October 5, 1912.)

No. 122.

SALVAGE (§ 34*)—NATURE OF SERVICE—TOWING SCHOONER ANCHORED IN STORMY WEATHER TO PORT.

The schooner Pendleton, on a voyage from Baltimore to Wilmington, N. C., with a cargo of acid phosphate in bulk, having encountered thick weather and heavy seas after passing Hatteras, on reaching a point to the westward of Frying Pan Shoals, anchored to await clearer weather. The master believed he was within 20 miles of Cape Fear light, but was not sure of his position. Water had entered through hawse pipe holes and wet some of the cargo, but was mostly pumped out. Two days later, the weather still being foggy, the steamship Italia, from Galveston, proceeding by way of Norfolk to European ports, came in sight, and on signal from the schooner the first officer went on board and was asked by the master of the schooner what he would charge to tow the schooner to a good anchorage near Wilmington. He would fix no price; but the steamship took the schooner in tow, and after some six hours left her anchored not far from Cape Fear light. The sea was then comparatively calm. The Italia was some 75 miles or more off her course, and, although neither vessel knew her exact location, the Italia claimed to have towed the schooner from 36 to 38 miles. *Held* that, while the service might be considered one of salvage, it was of low order, no risk being involved and the schooner being in no imminent or very real danger, and that, in view of the fact that the schooner was libeled without notice of the claim to her owner, the sum of $900, which he had offered on receiving notice of the suit, was a sufficient award; it not appearing that the Italia went out of her true course in performing the towage.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 80–83; Dec. Dig. § 34.*

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit by Enrico Villa, master of the Italian steamship Italia, and others, against the schooner Brina P. Pendleton, Fields S. Pendleton, claimant, for salvage. Decree for libelant.

Rountree & Carr, of Wilmington, N. C., and Convers & Kirlin, of New York City, for libelant.

John D. Bellamy & Son, of Wilmington, N. C., and Harry K. Goodrich, for claimant.

CONNOR, District Judge. The Brina P. Pendleton is a double-decked, wooden, four-masted schooner, of a gross tonnage of 933 tons, net 821 tons, length 192 feet, beam 28 feet, and depth 19 feet, the property of Fields S. Pendleton, of New York, built in 1902, rated, American Bureau of Shipping, for 15 years. On January 6, 1912, with a cargo of 1,278 tons of acid phosphate, in bulk, in charge of Capt. Larrabee, she left Baltimore, bound for Wilmington, N. C., carrying a crew of seven men. She had ordinary weather until she reached Hatteras, when she encountered heavy seas from the southeast; made Cape Lookout Lightship on Friday, January 12th. The captain says:

"From there on it set in very thick and heavy, with a northeast wind. There I took a southwest course to Frying Pan Shoals. The next morning at 4 o'clock knew I was in the vicinity of Frying Pan, as I had only 10 fathoms of water. Hauled out southeast, so I knew I was east of the Shoal. I tried west then a little ways, about 5 miles. Then I hauled up to the northwest and westward, as the wind allowed me to. The weather continued thick. I sounded—got a sounding. At 4 o'clock that day (13th) struck 14½ fathoms of water, to the westward of Frying Pan, and anchored the ship. As the wind was checking more to the northward then, I anchored—gave the chain 90 fathoms, lay comfortably, and furled the sails. Had another good anchor on the starboard, and the same amount of chain—weight of anchor, 3,800 to 4,000 pounds. Had two anchors of less weight. Found that in running down in this heavy gale of wind that the vessel was making some water forward—was coming in forward. We used a steam pump to get it out; had rather poor success; was putting cargo overboard. As the water strikes this cargo, it dissolves. We were pumping it out with the steam pump. We stopped using steam, and used hand pump; pump working satisfactorily. Hand pump goes below ceiling; steam pump does not. The ship stopped leaking. We ascertained, after she was discharged, that the leak was around the hawse pipes. After we got to anchor, had quite a fresh breeze that night. Saturday night. The next morning, or at midnight, it began to calm down. We anchored, as I judge, about 20 miles from the Cape Fear Light. Never pumped Saturday night. Had a watch on deck. We stopped pumping and let the ship stand. The mate and I stood watch, and had a man on deck all the time. In the morning the fog commenced to lift up about 9 o'clock, so you could see 2 or 3 miles. Pumped about an hour and a half; had no difficulty in freeing the vessel. The sea commenced to be smooth; not a very rough sea. On morning of 15th, about 9 o'clock, commenced to heave in my chain and commenced to hoist sails; got in about 15 fathoms and set our spanker, when some one called out 'Steamer!' The wind commenced to check to the westward; the wind was backward. Expected the wind would check more to the westward, and I would try to beat up and get near a towboat; beat up towards Wilmington harbor. I judged I was 20 miles off from the bar, perhaps a little farther. When the steamer was sighted, it was foggy; hard to tell which way she was headed. I thought for Wilmington; she was headed in. Then I ordered the flag set. Told one of the men to go out on the cross-trees and tie it on the topmost rigging to call the steamer's attention. This was done. Steamer went right on her

course and out of sight. I should judge the steamer was bearing from us. We were heading between north and northwest; that would be my judgment. As the steamer took no notice, I ordered the flag down. If I was where I thought I was, and he was where he thought he was, he would have landed on Frying Pan Shoals if he had held his course, unless he had taken a sounding."

The Italia is an iron screw steamer, eight years old; gross tonnage, 6,397; net, 4,207; carrying capacity of 8,500 tons; length 410 feet, beam 52 feet, depth 25 feet; engines, 2,700 horse power, classed A1 British Lloyd's; value, $300,000. On January 10, 1912, she sailed from Galveston bound for Norfolk for coal, thence to Genoa and Naples. Her captain, Enrico Villa, had a crew of 40 men. She carried a cargo of 12,000 bales of cotton and 90 tons of wood, valued at $550,000. From the 10th to 12th of January she had good weather in the Gulf. On the 13th and 14th of January, while in the Florida Strait, the weather was bad from the northwest. The captain says that, on the 14th and 15th he was in a fog "and about the eighth hour, in the morning of the 15th, the fog had gone away and the wind had gone down," etc.

"The last observation I had for the bearing was Carisford Light. After that I was navigated by compass and sounding. The last exact observation taken was 9 p. m. on the 12th of January, opposite Tortuga Light. The other observation is not marked down, because it is not a true observation."

On the morning of the 14th and 15th, the wind, according to the Italian scale, was "fresh wind." On the morning of the 15th, about 7 o'clock, it cleared up.

"I had not got the position exactly, but in a general way—was looking for the lightship of the Cape Fear. I went by lead soundings to find out the Cape Fear Light. First saw the Brina P. Pendleton at about 10:30, morning of the 15th; wind fresh and some sea; a little foggy. She was on the right about two points—on the starboard bow—about 4 or 5 miles away. She had a big flag at half mast. I went directly to him—went after him—astern; called with my megaphone; asked, 'What is the matter?' He said, 'Leaking; I want to go near Wilmington.' I did not understand very well what he spoke, and I told him, 'I send my boat.' I went around to the windward of him, put my boat in the water, and sent my chief officer, the boatswain, and two sailors on board, because, in the moment, I understood that he wanted to be towed; as I saw from the masts up I didn't believe in the towing. I sent the officer on purpose to ascertain if it was necessary or not. Then I saw on board the schooner some men pumping, and the whole side of the schooner was very dirty, of a yellow color. The officer went, and I make all around to protect my boat when they come back. * * * On the last mast they had one sail up—the spanker."

To this point there is no material contradiction in the testimony. The captains of the steamer and schooner differ as to the location of the schooner as she lay at anchor. There is serious controversy as to the condition of the schooner, the probable danger of remaining at anchor, attempting to go in without aid, the weather, etc. The captain and witnesses for libelant were Italians—could not speak English. Their testimony, taken under commission, was interpreted. This fact may reasonably account for some discrepancies. They all concur that the chief officer of the Italia, Giuseppe Riccardi, with

boatswain and sailors, went, in a light boat, to the schooner. The chief officer says:

"The captain put the engine slow, and we went to the stern part of the schooner to speak to the captain of the schooner; but it was impossible to hear that time, because the wind blew stronger, and the captain understood that she was leaking, that is all. I said to the captain: 'It is impossible to understand what he wants. You had better put out a boat.' The captain says: 'It is dangerous.' I said: 'Never mind, don't be afraid. I go; three good sailors.' We put out our starboard light boat—small boat, not very small—long boat. I went on board the schooner on the starboard poop."

He gives his version of the conversation with the captain of the schooner, saying:

"The captain came to see me just as I came on board. I said: 'I am chief officer of the steamer. Did you call to it?' He said: 'Yes; with my flag up, as you see now.' I says: 'What can we do for you?' He says: 'How much you want to take me from here to a good anchorage nearer Wilmington? I am going to Wilmington. I want good anchorage to Cape Fear. You understand that place.' I answered him: 'I can't fix any price, because that is not my business. I can't tell you. My owner will fix it.' He went with me to the chart room in the saloon, and says: 'Where do you think you are? Have you any observations?' I said: 'No; we have not had any observation in three days.' He said: 'I believe it to be true.' And he marked on the chart just the same position about where we believed it to be. He said again: 'How much you want?' I said: 'I can't tell you. I can't fix any price. If you want, we can do something.' He said 'Ask the captain if he wants to tow me.' He said: 'You see me. I am not in very good condition.' The deck was full of mud coming up from a pump. I said: 'Let me go on board and ask my captain if he wants to tow you.'"

He returned to the steamer. The boatswain and sailors remained in the boat during this interview. Witness says that the sea was "rough—water sometimes came in cold, very cold."

Capt. Larrabee says:

"This steamer came down and spoke us—came down our stern, hailed me, wanted to know what I wanted. I said: 'What will you tow me into Wilmington Bar for?' He says: 'Where are you, captain?' I says: 'How do you judge Bald Head bears?' He says: 'I don't know. How do you judge it?' I said: 'I judge it bears 20 miles.' He says: 'Well, that is about the way with me,' or something like that; I did not understand. The captain could talk no English. The chief officer and three men came in a small boat. I gave them a line on our starboard side of our rigging. The sea was comparatively smooth. The chief officer came on board. I invited him into the cabin. He said he was bound for Norfolk, from New Orleans. He said: 'What is your position? We don't know what ours is. We have no observation.' I said: 'I was in hopes you were going into Wilmington Bar.' I also asked him what he would tow me into Wilmington Bar for—asked him for a price. He says: 'Oh, captain, we will make no price—very little; very little; not much.' He asked me if we were in distress. I said: 'No, sir; no distress. I want to get into Wilmington Bar.' He offered to take me into Norfolk. I declined and said: 'I would take you under no circumstances, if I thought there would be a lawsuit over this. If you will take us up there for ordinary towage, I would like to have you take us up there.' He says: 'There will be no trouble.' I showed him a towline of 90 fathoms, 8-inch hawser. He claimed that he wanted a better and longer one. He left, and went on board the steamer at about 12 o'clock."

It is conceded that, upon the return of the chief officer to the steamer, she steamed ahead of the schooner, dropped anchor, took a 2-inch new line, ran it down to the schooner, and sent a sailor on board to take the ropes to the martingale and took the line from

them. There was no difficulty in getting the hawser on board. It was about 100 fathoms long. The steamer started with the schooner in tow, at about 2:30 p. m. Chief Officer Riccardi says that the water was "rough," very cold. He says that it was 3 o'clock when they started with the schooner in tow. The steamer took a "zigzag course," went by soundings; steered northerly for about 10 miles. Capt. Larrabee says:

"I saw the captain of the steamer had changed his course to northeast by my compass. I had been using the lead. When I saw him change his course I said: 'What is he doing?' I let him tow a couple of miles. * * * I went forward, blew the whistle. They slowed down. I blew it so hard, wanted to know what I wanted. I says: 'Where are you bound? You are not going to Wilmington Bar. Haul up your ship a little more to the northward and westward.' "

He did not do so at first, and Capt. Larrabee says:

"I told my engineer to blow the whistle as loud as he could. He sent the chief officer. I said: 'Haul that ship to the northward and westward, or I will cut your hawser where we are, as you are going to put us on Frying Pan Shoals. He hauled his ship to the northwest. He kept all courses between north and northwest and north by northwest. At 9 o'clock we got to anchorage in 6½ fathoms water; the wind was then about 15 or 16 miles an hour off the land; the sea very smooth. The next morning we could just see the Cape Fear Light."

The captain of the Italia gives substantially the same account of the course taken, etc. He says:.

"When he told me he was made fast, I went ahead and heaved my anchor. The wind blew me inside. * * * I take some soundings, because I have not the correct position; then I go with soundings alongside the banks, near to the banks, not further from them. At 8:30 I saw our light, and, at the same time, the schooner whistles from the boat, and told me: 'You are too much east. You go stranded.' I told the officer to tell him that I saw our light, but was not certain which light it was, because of the fog. I used the lead all the time. The light carried me east ¼ north. The officer told me the depth is 6½ fathoms. I was drawing 24 feet aft on my steamer. I stopped the engine and told the schooner that I could not go more ahead. The captain said he was all right. I told him that I would stay all night if he desired—would stand by him. He said it was not necessary; that he was near on shore. At the same time I had seen very well the light. I saw it was Cape Fear Light, and not the buoy; east ½ north. In the morning I saw the Cape Fear Lightship, when I came back. I left the schooner at 9 o'clock, came back to south just in line of 15 fathoms deep. Went out until I got that depth. Before I went away I saw the Cape Fear Sound Light. and took my route back to the south until I got 15 fathoms, and then headed up."

He says that the schooner was in 17-fathom water when she anchored. He says that, in his opinion, the schooner could not have weathered the wind and sea on the night of the 15th and morning of the 16th if she had remained at the point where she anchored. She would have gone ashore and been lost. The chief officer expresses the same opinion:

"While towing, the two vessels were pitching; but as they got nearer the land the sea went down. There was no danger to the men when we put them overboard in the small boat. Used about 16 or 17 tons of coal while towing, worth $3.25 a ton. Some slight damage done to the hawser—chafed. Average speed of Italia 10 to 10½ knots in good weather; while towing made average of 6½. Towed 36 to 38 miles, no more."

The witness, on cross-examination, was shown a chart upon which the locations of the schooner, as contended by claimants and by libelant, were indicated by letters; also lines indicating courses taken in towing. He was asked whether, if the schooner was at the point claimed by him, and he followed the courses indicated on the chart, the distance to the point at which he left her would not be 48½ miles; that, if he made 6 knots and was towing 5½ hours, to reconcile these statements, to which he answered:

"I have judged the distance by sight, and with the towing I might have easily been mistaken, especially during night. The points indicated are estimated, not exact."

He said "that it was not possible that the schooner could have been anchored 20 or 25 miles south of Cape Fear Lightship." He says that he was out of his course when he found the schooner, because he was looking for the soundings; was navigating to locate Cape Fear Lightship, and looking out for 15-fathom sounding—the 15-fathom course would have brought him to the lightship.

The schooner, on the morning of the 16th, got under way, sailed over the bar, and at noon got a towboat, reaching Wilmington that night about 9 o'clock—went to the discharging berth the next morning; pumped about an hour coming up the river, and about same time before discharging. She went from Wilmington to Wiggins, S. C., took on a load of hard pine, and discharged at New York. No repairs were made on her at Wilmington or Wiggins. One of the hawse pipes leaking; put in some oakum. Capt. Larrabee was asked why he did not continue to Wilmington Bar instead of anchoring in the first place, to which he responded:

"I couldn't; the wind was checking head to me. The wind was checking from the northwest into the northwest. I would have had to beat up there. It was coming on night, and thick, and I didn't feel like doing it."

He was shown a chart, and located the place where he first anchored; also where he anchored the second time, in 6½-fathom water. According to his log the steamer towed him 30 miles; that the reason why he wanted the Italia to tow him was to save time; had been laying there two days, and did not know but what he might lay there a week; his vessel was in no danger; that the flag set was not a distress signal; that his crew was not demoralized—was in good shape.

Entries in the chief officer of Italia's logbook were put in evidence, from and including January 13th to January 16th, showing, January 14th, that her course was north; state of the sea, "grosso"—"heavy." January 15th:

1 to 4 a. m.: North, sky "covered," sea "heavy"; 5 to 8 a. m., same; 9 to 12, same. Latitude, estimated, 33° 12'; longitude, estimated, 78° 22'. Note: "At 10:30 a. m. we are in sight of a steamer, with signals of calling. At 10:45 we stop to perform salvage. The schooner's name is Brina P. Pendleton." 1 to 4 p. m.: "Various courses." No mention of the wind, or state of the sky, or any barometer or thermometer observation. "Owing to the towing of the sailing schooner, we steer a course for Cape Fear at 3 o'clock and 10 minutes." 5 to 8 p. m.: "Various courses. State of the sky clear. State of the sea calm." 9 to 12: "E. S. E. Wind N. W. 4. Sky clear. Agitated

sea—corrected south course. At 8:30 p. m., in estimated latitude 33° 51', longitude, estimated. 78° 12', we sound and find 6½ fathoms of depth. Wind light from N. W. We see Cape Fear Lighthouse per east ¼ N. E., and we are about approximately 12 miles. Asked the captain of the schooner towed if he is satisfied with the anchorage. He, having answered in the affirmative, we let go the tow and continue our voyage."

On January 16th the weather was "clear"; sea, "heavy." The testimony of sailors on the schooner and the Italia was conflicting as to the state of the sea on the 15th, at the time the small boat went to the schooner and the towing began. The schooner was not injured during the voyage, or by reason of her experience from the 13th to the 15th January, inclusive. There is evidence to the effect that the steamer was out of her course—from 72 to 75 miles at the time she sighted the schooner; that, if she had continued a north course from the position in which she was when she saw the schooner, she would have gone on Frying Pan Shoals; that she was in peril; that if she had been in her course she would not have overtaken the schooner. If she had kept in 15-fathom water, she would not have gone on the shoals. Mr. Pendleton, owner of the schooner, says that he is acquainted with the Atlantic coast, and that, in his opinion, taking the testimony of the captain of the steamer, in regard to her course and navigation, that he saved time in taking the schooner in tow, and gives as his reason that, by doing so and taking his bearings, that he would not have found Frying Pan Lightship in the direction he was running under the conditions of the weather at that time. He says that the schooner was in good condition, thoroughly equipped, etc.

Two questions are presented. Upon each, divergent views are strongly urged by counsel. (1) Was the service rendered by the Italia to the schooner towage or salvage service? (2) If the latter, what is a fair award for such service?

The evidence in regard to the condition of the schooner and her crew, in respect to danger from leaking, rests very largely upon the testimony of her captain and two sailors, Thompson and Riola. So far as her safety was affected by the condition of the weather, the wind, and the sea, there is much conflict in the testimony. A definition of salvage service, which has received the approval of the courts, is found in The Lowther Castle, 195 Fed. 604. Judge Rellstab says:

"A salvage service is a service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger, either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstance of danger."

In an able and exhaustive opinion by Judge Brawley, in The Besnard (D. C.) 144 Fed. 992, in which a large number of cases, both English and American, are reviewed, it is said:

"The line of demarcation between towage and salvage is not perfectly defined."

He quotes from Dr. Lushington in The Charlotte, 3 W. Rob. 68:

"All services rendered at sea to a vessel in danger or distress are salvage services. It is not necessary, I conceive, that the distress shall be actual or immediate, or that the danger shall be imminent and absolute. It will be

sufficient if, at the time the assistance is rendered, the ship has encountered any damage or misfortune which might possibly expose her to destruction if the services were not rendered."

After noting the facts and rulings in a number of cases, the learned judge says:

"While there are many ingredients, the one essential element is that the property shall be saved from danger, either actually impending or reasonably to be apprehended."

The same learned and experienced judge in The Apache (C. C.) 124 Fed. 905, says:

"Any service or assistance applied for or received by a vessel in peril or distress, which in any measure conduces to its safety, is in the nature of salvage service, and is to be compensated upon principles more liberal than ordinary work."

The conditions found in The Besnard, supra, are, in many respects, similar to those found here, and much that is said in the well-considered opinion is of interest and value in determining the same questions presented by the testimony in this case. Referring to the condition of the bark at the time the service was rendered, Judge Brawley says:

"She had already encountered, and safely passed through, hardship and dangers infinitely greater than any likely to be met. Her master had never intimated any apprehension of personal danger or any intention of seeking personal safety."

After a careful examination of the evidence, with the aid of able arguments and briefs, I think that the schooner Brina P. Pendleton was, on January 15, 1912, equipped with sufficient steam and hand pumps, under usual conditions, to pump out such water as would, by the ordinary leakage of wooden vessels, come into her hold; that the water which was found in her came in through a hole provided for the hawse pipe; that the steam pump would have relieved her, but for the fact that, in bringing up the water, it also brought up, in solution, the acid phosphate; that she was supplied with sufficient anchor and chain for her safety. She had evidently passed through rough weather between the 12th and 13th of January, and a considerable quantity of water had come in through the hole provided for the hawse pipe. When on January 13th, she anchored, her captain prudently thought it safe to do so, taking into consideration her location with reference to Frying Pan Shoals and the wind. To what extent his crew were exhausted by working the hand pump is necessarily uncertain. Thompson and Riola, sailors on the schooner, deny that the crew was demoralized. It is manifest that they had been under some strain. The exact position of the schooner, when she anchored, is uncertain. Her captain says that she was in $14\frac{1}{2}$-fathom water, about 20 miles from the Bar. The captain of Italia places her in 17-fathom water and at a different place. The log of the Italia, by estimation, fixes her location; whereas the schooner's log is not introduced. He puts the distance which he towed her as "36 to 38 miles; no more." The time consumed is 6 hours, and the speed at $6\frac{1}{2}$ knots. This corroborates his estimate.

It is insisted, on the contrary, that, if her location was as fixed by the Italia, the towage to the point at which she was anchored would be 48 miles. Both captains were estimating the location. I am inclined to accept, as the more reliable, the opinion of the captain of the schooner. It is evident that he was in the neighborhood of Frying Pan Shoals—a place of great peril. He had, on the morning of the 15th, before the steamer came in sight, begun drawing in his anchor, had drawn in about 15 fathoms, and had hoisted his spanker, all of which sustains his contention that it was his purpose to start for the Bar. It is also evident, from his testimony, that when the steamer was sighted he had "his flag set" for the purpose of attracting her attention. He assigns as his reason for doing so that he wanted towage, because he might lie there a week longer. He concedes that, on the 12th and 13th, he experienced heavy weather, fogs, etc. The only material difference in the testimony of the chief officer of the Italia and the captain of the schooner, in regard to their conversation, after the former came on board the schooner, is that the officer says that Capt. Larrabee said:

"You see me. I am not in very good condition."

This is denied. The language used by both indicates that they were talking about towing; but Capt. Larrabee concedes that the chief officer refused to name or fix any price for his service. He accepted the service of the Italia, with the distinct understanding that the amount to be paid was left open to be settled by the owners of the Italia. The chief officer was evidently impressed with the belief that, under existing conditions, the safety of the schooner would be endangered if he left her where she had anchored. The captain may well have thought otherwise, and yet preferred to accept the service of the steamer upon the only terms which he could get. That she had experienced bad weather, that water had come into her hold, and that, by reason of the character of her cargo, the steam pump could not well be used, is all beyond controversy. The season was midwinter, and, by the testimony of Mr. Felger, in charge of the Weather Bureau at Wilmington, as shown by his daily record:

"There was [on the 15th] a little disturbance on the Atlantic Coast in the morning. The forecast issued was: 'Brisk N. W. wind.' It was very cold."

It is held that:

"Assisting a vessel in a situation of actual apprehension, though not of actual danger, is salvage." The Lowther Castle, supra.

The evidence seems to bring the case within the principle laid down by Judge Brawley in The Besnard, supra:

"Any peril that can properly be said to have been impending was inconsiderable, uncertain, and distant, existing rather in the imagination of the putative salvors than in reality. * * * There was no special skill or dexterity displayed, no fatigue endured, no courage evinced, not the least danger encountered. Even were it conceded that this is a case of a vessel in distress, and therefore a case of salvage, it would be salvage of the lowest order, and for the remuneration justly earned would be little more than compensation pro opere et labore. The service would be regarded as a simple case of towage, and remunerated as such, but for the fact that the master of

the tug gave notice to the master of the bark that something more than towage would be demanded. The acceptance of service in those conditions, therefore, requires the payment of other and higher remuneration than for an ordinary towage service."

In this case it would seem that all parties were talking about towage, but the officers of the Italia insisted that the question of compensation should be left open. In The Emily B. Souder, Fed. Cas. No. 4,458, cited in The Besnard, supra, Chief Justice Waite, reversing the decree below, said that the service rendered was "towage of an unusual character." In The Viola, 55 Fed. 829, 5 C. C. A. 283, an award was made for "extraordinary towage." This case is in the twilight zone which separates the two kinds of service which have not, and probably cannot well be perfectly defined. It is not very material whether the service be called "salvage of a low order" or "towage of an unusual character."

What amount should be awarded libelant? It is well settled that:

"Compensation as salvage is not viewed by the admiralty courts merely as pay on the principle of a quantum meruit, or as a remuneration pro opere et labore, but as a reward given for perilous services voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." The Blackwall, 10 Wall. 1, 19 L. Ed. 870.

It is also stated that:

"Where salvage services are rendered by merchant steamers, they should be favored in determining the amount of the award." 24 Am. & Eng. Enc. 1206.

Judge Hughes, in The Sandringham (D. C.) 10 Fed. 556 (Eastern District, Va.), wisely says:

"That although the amount lies within the discretion of the court, yet a judge is not at liberty to render an arbitrary judgment at his own individual discretion or caprice, but must be governed by the teachings, precedents, and principles of the law of salvage."

See The Lyman M. Law, 122 Fed. 823.

Adopting the elements proper to be considered in fixing the award as laid down in that case, I find:

First. The degree of danger from which the lives or property are rescued.

In this case the danger was not imminent or very real. At the time the steamer took the schooner in tow, it was remote, speculative, and yet possible.

Second. The value of the property saved.

The appraisers appointed by the court fix the value of the schooner at $14,000. While this valuation is vigorously attacked, and evidence offered to sustain the attack, I see no good reason for rejecting the appraisal. The appraisers were orally examined before me. I find the value of the cargo to be $7,000, and the freight, to be received, I find to be $1,000, making an aggregate of $22,000.

Third. The risk incurred by the salvors.

This was very slight. No danger or difficulty was experienced in going from the steamer in the small boat to the schooner, or in getting the line fast aboard the schooner. The sea was somewhat rough

at that time, but became calm as the steamer neared the shore. Soundings were easily made, and with the warning given by the captain of the schooner no difficulty was found in towing her into a safe anchorage. The captain of the steamer says that he was in no danger.

Fourth. The value of the property of the salvor used in the service.

This was large, some $800,000; but, as has been seen, there was but little exposure, and the service was simple and easily performed. The steamer was out of her course by some 75 miles, and, as conceded by her captain, was uncertain as to her exact location. He was, however, in 15-fathom water, and was making careful soundings, seeking the Cape Fear Lightship, from which he would have taken his bearings and returned to his course. While I am not inclined to adopt the view that he was in great peril of going upon Frying Pan Shoals, I am of the opinion that he sustained no danger by "coming up" with and towing the schooner into safe anchorage. I think that their meeting was of mutual benefit.

Fifth. The skill shown in rendering the service.

While it is true that, but for the warning of the captain of the schooner, the steamer would probably have gone into danger, this was due to the fact that both were feeling their way. The captain of the steamer says he was "going like a blind man—according to a blind man with a stick." While there was nothing in the conditions to call for a high degree of skill, I see no reason to criticise the manner in which the service was rendered, under the circumstances. It was satisfactory and successful.

Sixth. The time and labor occupied.

These elements are fixed without controversy.

Seventh. The degree of success achieved.

There is no controversy in this respect. The service was successfully performed. There are facts apparent in this case which cannot be properly overlooked. It is an important and well-recognized element, to be considered in fixing the character of the service and in fixing the award, that:

"Salvage is in the nature of a bounty for extraordinary exertions, as distinguished from ordinary exertions, being the outgrowth of public policy, and designed to encourage persons who are under no legal obligations to do so to go to the rescue of vessels exposed to perils beyond their own ability to subdue, by giving a reward in addition to compensation for the work done."

In this case the service was voluntary; but it is manifest, from the conduct of the chief officer in his conversation with the captain of the schooner before undertaking the service, referred to by both as towing, that he was keeping in mind the question of compensation, and determined to leave it unsettled. He refused to name any price. He says that the captain of the schooner said, "Ask the captain if he wants to tow me," and the captain of the steamer says:

"On the report of the first officer, I decided to tow the schooner, because I believed that, if she had been left there, it would have been a loss."

He made his report to the owners, and they retained proctors in New York, whose office is "not over 500 feet from that of the owner of the schooner." No demand was made on him, nor was any op-

portunity given him to adjust the claim. The first notice which he had of the service was a telegram from Wilmington stating that his schooner had been libeled. On January 24, 1912, nine days after the service, a libel was prepared and verified by one of the proctors, in which it was alleged that he was informed and believed that the value of the schooner was $55,000 and upwards, the value of her cargo was $35,000 and upwards, and "the amount of her pending freight, as he is informed and believes, was $5,000 and upwards." The truth in all of these respects could have been ascertained with ease. It was further alleged that:

"It was ascertained from the captain of the schooner that his vessel was leaking very badly, that his crew was exhausted from pumping and badly demoralized. * * * In response to this request the captain of Italia, although a very heavy sea was running, sent a small boat under the command of his chief officer over to the schooner. The chief officer was informed that there was much water in the hold of the schooner, that she was working not only her steam pumps without overcoming the leaks, that her men were much exhausted by the effort to keep her afloat, and very much demoralized and frightened," etc.

The libelant demanded compensation in the sum of $37,500. The schooner was released under a bond of $8,000, with the consent of proctor for libelant. The testimony of the captain and chief officer of the steamer, upon whose report the libel was framed, falls very far short of establishing the allegations of the libel. The claimant, upon being notified that his schooner was libeled in Wilmington, at once tendered to proctors for libelant $900, which was refused. He afterwards paid into court $500, together with $30 to cover cost.

In the light of all of the evidence, and the course pursued by the libelant in failing to give the owner an opportunity to adjust the claim, or of making any claim on him or the captain of the schooner, as it was his manifest duty to do before libeling the schooner, making an exorbitant demand for salvage, the libelants are not in a position to invoke the principle upon which courts of admiralty make liberal awards for voluntary service, endangering life and property to rescue vessels exposed to perils of the sea. In The Besnard, supra, the value of the bark was $8,500; value of cargo, $300,000. Judge Brawley gave $1,000, assigning as a reason therefor that an offer was made to pay that amount without litigation. In the light of all of the circumstances, I think $900 an ample award—three-fourths to the steamer, one-fourth to the crew. The cost will be divided equally between the parties.