## THE PLANTER.

(District Court, W. D. Washington, N. D. September 4, 1914.)

No. 3344.

SALVAGE (§ 34*)—NATURE OF SERVICE—TOWING INTO PORT WATER-LOGGED LUMBER VESSEL.

A barkentine loaded with lumber, bound southward for San Francisco, when 160 miles southwest of Cape Flattery, encountered a storm which caused her to leak, and she began to fill. Unable to make headway, the captain turned back for Puget Sound. Five days after the storm commenced, and after jettisoning 100,000 feet of lumber, he arrived 7 miles off the Straits, where he beat about for another day unable to enter, because of the wind. On the second day, in response to his signal, libelant's tug came and towed the vessel into Port Townsend. She was then full of water. *Held*, that the vessel was in danger, and the service rendered by the tug was one of "salvage," although not of high order, and that she was entitled to an award of $800, exclusive of her crew; the value of the saved vessel, with cargo, being $23,000.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 80–83; Dec. Dig. § 34.*

For other definitions, see Words and Phrases, First and Second Series, Salvage.]

In Admiralty. Suit by the Admiralty Tugboat Company, owner of the tug Wyadda, against the barkentine Planter, John Kentfield, claimant, in which Charles H. Finkel, Frank Fendall, Fritzjof Kittleson and John Knutzen became interveners. Decree for libelants and interveners.

Hughes, McMicken, Dovell & Ramsey, of Seattle, Wash., for libelant.

Bogle, Graves, Merritt & Bogle, of Seattle, Wash., for claimants.

Tucker & Hyland, of Seattle, Wash., for interveners.

NETERER, District Judge. On October 6, 1906, libel was filed by the Admiralty Tugboat Company, a corporation, owner of the steam tug Wyadda for a salvage claim, and monition and attachment were issued, and the American barkentine Planter taken into custody by the United States marshal. In November following intervening libels were filed by members of the crew of the tug Wyadda, asking for salvage service rendered by them to the Planter. Answer was filed, denying a salvage liability, and the cause was referred to the United States commissioner to take the testimony, and the issue is now presented upon the evidence reported.

From the testimony reported, it appears that on September 27, 1906, the Planter, with a full cargo of lumber—approximately 600,000 feet, including a deck load of approximately 300,000 feet, sailed from Port Gamble for San Francisco. On October 1st, when she was about 100 miles to the westward from the entrance to the Columbia river, she encountered a heavy southeast storm, which continued throughout the day, and about 2 o'clock on the morning of the 2d shifted to the southwest. A heavy gale continued to blow until about 10 o'clock on the

evening of the 2d. During the shifting of the wind a heavy cross-sea was encountered, and at about 9 o'clock a. m. on the 2d the vessel sprang a leak and began to fill with water. About 5 o'clock p. m. there was about 3½ feet of water in the hold, notwithstanding the pumps were continuously operating. The captain, unable to make any headway toward San Francisco, wore ship and headed for Puget Sound. This was about 160 miles to the southwest of Cape Flattery and 100 miles to the westward of the entrance to the Columbia river. The vessel then proceeded on her course, and about 10 o'clock a. m., October 3d, she had about 8 feet of water in her hold and listed to starboard. One hundred thousand feet of lumber was jettisoned to bring her back to an even keel. The vessel reached Cape Flattery on the morning of October 5th. When the vessel arrived off Cape Flattery a southeast wind was blowing out of the Straits, and the vessel beat back and forth across the water off of Cape Flattery, out from the entrance into the Straits, and about 7 miles from shore, until the morning of the 6th, when the tug Wyadda hove in sight, towing the schooner Talbot out to sea. For the purpose of attracting the tug, the captain hoisted two cork fenders to the masthead, and the tug Wyadda, after having taken the Talbot out to sea, returned to the Planter, when the following conversation took place, as reported by the captain of the Planter:

"He asked me if I wanted a tow, and I told him, 'Yes; at the usual rates.' He said he was not allowed to tow me in the condition I was in and make a bargain. I told him there was nothing to keep me out there but the head wind. If I had a fair wind, I would not want him. Then he said that his orders were to make no bargain in a case like that. Then he said that his owners would do the right thing with me; that they would not rob me. I told him again there was nothing but the head wind to keep me out there. He refused to tow me and make any bargain, so I told him to take the hawser."

At this time the Planter was completely filled with water. The waves broke over her bulwark. The crew had taken their bedding from below on top of the lumber upon the upper deck. Some of it had been hung in the rigging to dry. The crew cooked their meals in a coal oil can on top of the deck load. She was on an even keel, her sails were in good condition, she answered to her helm, and she had 75 tons of ballast in her hold.

The United States Weather Bureau report shows that the wind at Tatoosh Island from 12 o'clock midnight to 9 o'clock a. m., October 6th, was from the east and had a velocity of from 7 to 20 miles an hour; from 9 to 10 a. m., the wind was southwest, with a velocity of 4 miles an hour; from 10 to 11 a. m., south, with a velocity of 16 miles an hour; from 11 a. m. to 3 p. m., southwest, with a velocity of 15 to 7 miles an hour; and from 3 p. m. to midnight, south, with a velocity of 10 to 7 miles an hour. A southwest wind prevailing outside of Flattery would blow a disabled vessel onto the Vancouver shore. While the vessel was not disabled in the sense that any of her paraphernalia or appliances were out of commission, her water-clogged condition enveloped her with an element of danger.

The crew of the Planter consisted of six men forward, captain, mate, second mate, and cook. The vessel was provisioned for three weeks or a month. The value of the tug was $35,000. The value of the

Planter, including the cargo, was $23,400. The usual time required to tow a loaded vessel from the point where the Planter was taken to Port Townsend, her destination, is 14 hours; the time required to tow the Planter was 20 hours.

It is strongly urged by claimants, at the bar, that the only service rendered was a towage service; that the vessel was not in a position of danger, or where danger could be reasonably apprehended. I am of the opinion, however, that from all of the evidence presented, taking into consideration the various phases as disclosed by the testimony, and approaching the issue from every viewpoint, that there was a sufficient element of danger, actual and apparent, which, under the circumstances, should make the service a salvage service, rather than a towage service. The vessel was unquestionably assisted in getting safely away from apparent peril. It is, however, a salvage service of a low order. There was no element of danger in the services rendered, either to the crew or to the tug. Neither was exposed to any risks. The tug was not required to deviate from its usual course. It did take, however, 6 or 8 hours more to perform the service than would have been required to return without the tow.

I think an award of $800 as salvage to the Tugboat Company, and $40 to each of the two members of the crew pressing their claim, to be ample. The Robert S. Besnard (D. C.) 144 Fed. 992; The Brina P. Pendleton (D. C.) 200 Fed. 848; The New Camelia, 105 Fed. 607, 44 C. C. A. 642; The Grace Dollar (D. C.) 103 Fed. 665; The Beaconsfield (D. C.) 67 Fed. 144. Interest to be computed from the date of decree.